[No. 7458.   Decided September 24, 1908.]

THE CITY OF SEATTLE, *Respondent*, v. FRED HURST,
*Appellant.*[1]

MUNICIPAL CORPORATIONS—ORDINANCES—SOLICITATION IN DEPOTS—
CONTRACT VIOLATING ORDINANCE.  An ordinance making it a misde-
meanor for hack drivers to solict customers for hire in railroad sta-
tions when used by passengers leaving or entering the same, pre-
vents the owner of a depot from permitting such solicitation by con-
tract granting the exclusive privilege of such solicitation.

CONSTITUTIONAL LAW—RIGHT OF CONTRACT.  An ordinance pro-
hibiting solicitation by hack drivers in railroad stations when used
by passengers entering or leaving the same is not an unreasonable
restriction upon the right of private contract, especially where the
passengers have opportunity on the trains and at an office in the
building to fulfill their wants without solicitation.

SAME—POLICE POWER.  Such an ordinance is not invalid as to a
pre-existing contract allowing solicitation; since all contracts are
subject to the police power, and any limitation of the contract would
be *damnum absque injuria.*

Appeal from a judgment of the superior court for King
county, Frater, J., entered May 22, 1908, upon a trial and
conviction of the misdemeanor of soliciting passengers for
hire in a railway station, after a trial before the court upon
an agreed statement of facts.   Affirmed.

*J. B. Metcalfe,* for appellant.

*Ellis de Bruler,* for respondent.

MOUNT, J.—The appellant was convicted under an or-
dinance of the city of Seattle making it a misdemeanor for
hack solicitors to solicit passengers for hire in a railroad
station when such station is being used by passengers leaving
or entering.   He appeals from a judgment assessing a fine
against him.

The facts are agreed to, as follows:

"That the defendant, on the 3d day of July, 1907, was
acting and engaged as a hack solicitor, and while engaged

[1]Reported in 97 Pac. 454.

in such occupation soliciting customers and passengers for hire, did go upon the railroad station and in the railroad depot, in the said city of Seattle, at the intersection of King street and Third avenue south, known as the King street station or Union depot, while the same was being used by passengers leaving said railroad station; that this was against the provisions of sections 1 and 8 of ordinance 14742 of the city of Seattle, as alleged in said complaint, said ordinance being approved November 20, 1906, and entitled, 'An ordinance relating to the conduct of persons and to the places occupied by them and vehicles used by them while engaged as hack or omnibus driver, hotel runner, steamboat runner, expressman or solicitor of customers or passengers for hire and providing a penalty for any violation thereof,' section 1 of which reads as follows: 'No hack or omnibus driver, hotel runner, steamboat runner, expressman or solicitor while engaged in such occupation and soliciting customers or passengers for hire, shall be allowed upon any wharf or railroad station or roadway leading therein in the city of Seattle when such wharf, railroad station or railway leading therein is being used by passengers leaving or entering such wharf or railroad station.' Section 8 reads as follows: 'Any person who shall violate any of the provisions of this ordinance shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $50 or be imprisoned not more than thirty days or both fined and imprisoned.' That the defendant, Fred Hurst, is an employee of the Seattle Transfer Company, a corporation duly organized and existing under the laws of the state of Washington and is a common carrier of passengers and baggage for hire; and that the said Fred Hurst, as an employee of the said Seattle Transfer Company, was engaged in the solicitation, as such employee, of customers for hire, within the limits of the building at the corner of Third avenue and King street in the city of Seattle, county and state aforesaid. And while so conducting and carrying on his said employment and not in any wise interfering with or molesting the said passengers and traffic from said building, further than soliciting passengers for hire, as hereinabove set forth, as fully appears by the contract of the said Seattle Transfer Company and the Great Northern Railway Company, the provisions of which said contract are hereby referred to and made a part of this

agreed statement of facts, and was so engaged with the consent and permission of the said railroad companies, as set forth in said contract. It is also stipulated that this agreed statement of facts shall be filed as Exhibit 'A' in this case and stand and remain as a full and complete statement of facts on appeal in event either party desires to take appeal from the decisions of the court herein."

The agreement is as follows:

"Agreement, entered into this 3rd day of June, 1905, between one Great Northern Railway Company, the party of the first part, and the Seattle Transfer Company, party of the second part,

"Witnesseth: Whereas, the party of the first part deems it advisable, for the convenience of passengers coming into the city of Seattle, Washington, upon its trains, that facilities be furnished to such passengers upon said trains and in its depot at said city of Seattle, to arrange for the transfer of their baggage and for their own passage by omnibus, carriages, or otherwise, to various parts of the city of Seattle and other railway depots and steamboat wharves therein; and

"Whereas, it would greatly interfere with the business of the party of the first part and the comfort and convenience of said passengers to permit hackmen and transfer men generally to enter upon its said trains and into its said depot for the purpose of soliciting the patronage of said passengers;

"Now, therefore, the parties hereto covenant and agree as follows: The party of the first part, in consideration of the payments and covenants herein stipulated to be made, kept and performed by the party of the second part, does hereby grant to the party of the second part, for and during the term of three years from and after the date thereof, the exclusive right and privilege to enter upon the trains of the party of the first part approaching said Seattle and into the said depot and train-shed of the party of the first part at said Seattle, and to solicit and contract with passengers for said Seattle thereon and therein for the transfer and delivery of their baggage and for their passage in omnibus or otherwise to various parts of said city of Seattle and to the depots of other railway lines and to the wharves of boat lines therein, and for the hiring of hacks, cabs and carriages to such passengers for such transfer and passage; and also to keep and

use, during the term hereof, a stand in the depot of the party of the first part at said Seattle, to be set apart to the said party of the second part for the purpose of transacting such business.

"The party of the second part shall and will, during the term aforesaid, in connection with said business, upon the arrival of passenger trains of the party of the first part at its depot, keep and maintain, an agent at said stand in said depot to attend to and accommodate passengers entering said Seattle upon the trains of the party of the first part, and the party of the second part shall and will, during said term, cause one of its agents to meet all important passenger trains of the party of the first part approaching said Seattle, before they reach the said depot, and to furnish to the passengers on such trains an opportunity to arrange for passage in said omnibuses, and for the hiring of carriages and the transfer and delivery of baggage as aforesaid before arriving at said depot. The party of the first part shall and will permit such agents so meeting such trains to ride thereon without compensation for the purpose of transacting such business. The party of the first part shall and will in each year during the continuance of this contract issue not to exceed four annual passes, good over the lines of the party of the first part within the state of Washington. Such passes to be issued in favor of such officers or employees of the party of the second part as its president or general manager shall direct. The party of the second part shall and will cause said agents so to be kept and maintained at said stand in said depot upon the arrival of trains of the party of the first part and said agents so to be caused to meet important trains approaching said city of Seattle to wear a cap similar to those worn by railway employees, lettered in such manner as to plainly indicate to passengers and employees of the party of the first part the nature of the business of such agent. All agents and employees of the party of the second part engaged in the performance of the business aforesaid shall transact such business in and about said depot and upon said trains in a quiet and polite manner, and they shall in this regard be subject to the directions of the conductors upon such trains and of the depot master in charge of said depot; and the party of the second part shall and will dismiss from his service in or upon said trains and in or about said depot any

agent, driver or other employee upon receiving written notice from the party of the first part that any such employee or agent is objectionable to the party of the first part. The party of the second part shall, during the term aforesaid, have and cause to be present at said depot upon the arrival of all important passenger trains of the party of the first part one or more omnibuses to take passengers arriving thereon to various hotels in said city of Seattle and to the depot of other railways therein, and shall also have and cause to be within call at said depot on the arrival of all trains a sufficient number of hacks, carriages or cabs to accommodate the passengers coming into said depot upon said trains on all ordinary occasions. Such hacks, carriages, cabs and omnibuses shall be kept in a clean, neat and serviceable condition and provided with strong, gentle and serviceable horses, and the drivers in charge thereof shall be of temperate habits, polite, honest and reliable and capable of performing their duties in an efficient manner. None of such drivers or other employees in charge of such omnibuses, hacks, carriages or cabs shall be permitted to enter into or upon said trains, depot or train-shed of the party of the first part for the purpose of soliciting the patronage of passengers, but all such soliciting and contracting with passengers within said depot and upon said trains shall be conducted by said agents hereinbefore mentioned. The scale of charges for the service to be rendered to passengers hereunder shall in all cases be reasonable and not greater than those provided for by the ordinance of the said city of Seattle, and proof of any exorbitant or unfair charge or dealing by any driver, employee or agent of the party of the second part to or with any of said passengers shall be deemed sufficient grounds for the dismissal of such transfer employee from the service of the party of the second part upon demand of the party of the first part.

"The party of the second part shall and will indemnify and save harmless the party of the first part of and from any and all damage costs, expenses or liabilities on account of any personal injury to any of such employees of the party of the second part while in or upon the said trains of the party of the first part or in its said depot and train-shed, in the transaction of the business of the party of the second part hereunder, whenever injury shall be in any manner caused by de-

railment of said trains or improper operation thereof, by defects in said depot or train-shed, or the platforms or approaches thereto or otherwise by the negligence of the party of the first part.

"The party of the second part shall, in the performance of the service hereinbefore provided, be deemed to be a common carrier of passengers and baggage, and the party of the second part hereby assumes all risk of and liability for personal injuries to passengers, and for loss or damage to baggage in any manner caused by the negligence of the party of the second part, its employees or agent, otherwise, in and about the transaction of the business aforesaid; and the party of the second part shall and will indemnify and save harmless the party of the first part of and from any and all damages, costs, charges or liabilities to any such persons on account of such personal injuries to any such passengers, or loss of or injury to the baggage of any such passengers while being transferred or transported by the party of the second part, as hereinbefore provided. The party of the second part shall and will pay to the party of the first part, for the privilege hereby granted, the sum of four hundred dollars per year payable in advance, in monthly installments of thirty-three and 22-100 dollars on the 15th day of each and every month during said term. In case the party of the second part shall make default in any of the payments, covenants or conditions hereinbefore stipulated to be kept and performed by the party of the second part and such default shall continue for the period of twenty days after written notice thereof from the party of the first part, then the party of the first part may, at its option, terminate, cancel and annul this agreement and the rights and privileges thereby granted, upon ten days' notice in writing to the party of the second part of its intention so to do.

"In witness whereof, the parties hereto have caused this agreement to be duly executed the day and year first hereinbefore written."

It is argued by the appellant, at length, that the King street station or Union depot is the property of the Great Northern Railway Company, and as such is to be deemed in every legal sense private property of the railway company as between itself and those of the general public who have no

occasion to use the depot for purposes of transportation, and that it is lawful for the railway or depot company to make a contract granting special privileges to certain persons for supplying passengers with hacks or conveyance or baggage transfer. Many cases are cited to support that position. Among the cases are *Oregon Short Line R. Co. v. Davidson* (Utah), 94 Pac. 10; *Union Depot & R. Co. v. Meeking* (Colo.) 94 Pac. 16; *Hedding v. Gallagher*, 72 N. H. 377, 57 Atl. 225; *Godbout v. St. Paul Union Depot Co.*, 79 Minn. 188, 81 N. W. 835, 47 L. R. A. 532; *Donovan v. Pennsylvania Co.*, 199 U. S. 279, 26 Sup. Ct. 91, 51 L. Ed. 192.

There are many other cases which sustain the position above stated; but that position is not the controlling question in this case. It may be conceded that the depot is the private property of the railway company, and that the railway company may grant special privileges therein. But this case, in our opinion, depends upon the validity of the ordinance. If the ordinance is valid, making it a misdemeanor for hack solicitors to solicit customers for hire in railroad stations when such stations are being used by passengers leaving and entering the same, then it cannot be contended reasonably that a private owner may by a contract nullify the ordinance by permitting one or more persons to violate the ordinance. *Chillicothe v. Brown*, 38 Mo. App. 609.

It is argued by appellant that the ordinance is invalid because it is unreasonable. It is not claimed that the city is not authorized to pass ordinances regulating all occupations which affect the good order or public peace; that authority is expressly given. Pierce's Code, 1905, § 3732, subds. 34 and 36 (Bal. Code, § 1125). But it is argued that the ordinance is unreasonable because it restricts the right of private contract and the use of private property, and that the contract between the railway company and the transfer company is both reasonable and necessary. If there

were no ordinance prohibiting hack solicitors from soliciting passengers, then the contract limiting the number in the railway station might become necessary. But with an ordinance prohibiting such solicitation, it is not clear how that part of the contract is necessary either for public order or the convenience of passengers, especially where passengers have an opportunity on the trains and at an office in the building to make their wants known and have them cared for without solicitation from others. The fact that the contract is reasonable does not necessarily argue that the ordinance is unreasonable.

"An ordinance to be void for unreasonableness must be *plainly and clearly* unreasonable. There must be evidence of weight that it took inception either in a mistake, or in a spirit of fraud or wantonness on the part of the enacting body." Horr and Bemis, Municipal Police Ordinances, § 127.

See, also, *Walla Walla v. Ferdon*, 21 Wash. 308, 57 Pac. 796.

The object of the ordinance in question was, no doubt, to protect the traveling public from annoyance by hack drivers, hotel runners, expressmen and others while going to and from boats and trains. It operates as a benefit to these common carriers in the performance of their duties. In this connection the language used by Justice Harlan, in *Donovan v. Pennsylvania Co., supra*, at page 295, is appropriate, as follows:

"Applying these principles to the case before us, it would seem to be clear that the Pennsylvania Company had the right—if it was not its legal duty—to erect and maintain a passenger station and depot buildings in Chicago for the accommodation of passengers and shippers as well as for its own benefit; and that it was its duty to manage that station so as to subserve, primarily, the convenience, comfort and safety of passengers and the wants of shippers. It was therefore its duty to see to it that passengers were not annoyed, disturbed or obstructed in the use either of its station house or of the grounds over which such passengers, whether

arriving or departing, would pass. It was to that end—
primarily as we may assume from the record—that the Penn-
sylvania Company made an arrangement with a single com-
pany to supply all vehicles necessary for passengers. We
cannot say that that arrangement was either unnecessary,
unreasonable or arbitrary; on the contrary, it is easy to see
how, in a great city, and in a constantly crowded railway sta-
tion, such an arrangement might promote the comfort and
convenience of passengers arriving and departing, as well as
the efficient conduct of the company's business."

These are, no doubt, some of the reasons which prompted
the enactment of the ordinance in question. The ordinance
does not affect the right of the railway or depot company to
employ men for itself, or to contract so as to permit one
company or person or any number of persons, to care for
the comfort or desires of passengers. The ordinance simply
prohibits solicitors from soliciting business from passengers
at certain times in railway stations, and nothing more. We
can see nothing unreasonable in this. On the other hand, the
regulation seems to us most reasonable, and cases may
readily be imagined where such regulation might be neces-
sary to protect passengers from annoyance and confusion,
even where the privilege of such solicitation was confined by
contract to one company like the one in this case. If the
case of *Napman v. People*, 19 Mich. 352, cited and relied
upon by the appellant, holds that a city authorized to regu-
late all occupations which affect good order may not regulate
the occupation of hack drivers within railway stations, then
we do not desire to follow that case. We prefer to follow the
case of *Chillicothe v. Brown, supra*, which holds the op-
posite view.

The ordinance regulating hack solicitors, etc., in depots
was passed after the contract above set out was entered into.
Appellant argues that the ordinance, therefore, impairs the
obligation of the contract, and is void for that reason. This
does not follow, because

"The ordinance is a valid exercise of the power with which

the municipal authorities were clothed; a power intended for the protection of the public and the promotion of good order, and its exercise deemed necessary for the public benefit. If thereby pre-existing private rights are restrained or limited, the restraint or limitation is *damnum absque injuria.*"

All contracts are subject to this power, the exercise of which is neither abridged nor delayed by reason of existing contracts. *Lindsay v. Anniston,* 104 Ala. 257, 16 South. 545, 53 Am. St. 44, 27 L. R. A. 436.

For these reasons we think the ordinance is reasonable, is a valid exercise of police power, and that the railway company or the depot company may not enter into a contract which nullifies the provisions of the ordinance. The judgment appealed from must therefore be affirmed.

HADLEY, C. J., FULLERTON, RUDKIN, and CROW, JJ., concur.