# Suburban Water Co., Appellant, v. Oakmont Borough.

*Public Service Commission—Water companies—Change of rates —Boroughs—Reasonableness of rates—Burden of proof—Act of July 26, 1913, P. L. 1378—Notice—Effective rate—Contracts—Act of July 6, 1917, P. L. 704—Impairment of obligation of contract— Federal and State Constitution—Execution under control of court.*

1. Where a public service company has filed a schedule of rates, and a complaint is filed against the reasonableness of the rates within the thirty days before the schedule becomes effective, as provided by the Act of July 26, 1913, P. L. 1378, the burden of proof is on the utility to prove the rates reasonable; but, if the complaint is made after the schedule becomes effective, the burden is on the complainant to prove them unreasonable.

2. Whether a complaint is filed before or after the thirty-day period, if the utility has complied with the provisions of the statute as to notice of the time when the proposed change will go into effect, the rate becomes, on the effective date, an effective rate, and, as such, it is a collectible rate, or one that may be sued for. Injustice done to consumers may be worked out on petition for reparation.

3. There can be no legal rate except the last tariff rate published as provided by the Act of 1913, section 7, article III, section 1 (E and F), article II, and section 41, article VI, and the effective rate

thus published supersedes all prior rates covering the service therein called for.

4. The Public Service Act does not recognize any right to change a rate other than a published tariff rate, either in an individual or a municipality.

5. A utility may not of its own motion have an affirmative order approving its rates.

6. Where a borough files a complaint against the reasonableness of rates filed by a water company, it cannot, pending a decision of the Public Service Commission, and in a suit against it by the company to recover for water at the rate specified by the schedule, base a defense on rights under the Borough Code as amended by the Act of July 6, 1917, P. L. 704, inasmuch as that code expressly excepts provisions of the Public Service Act.

7. Section 11, article III, of the Public Service Act relating to the approval of the contracts between public service companies and municipal corporations, has no application in such a case.

8. Rate-making by a public service company involves no element of consent by a municipality when made.

9. The rate, when established, is for the time being a legislative rate.

10. The contracts mentioned in section 11 of the act are such as must meet an investigation in the special manner pointed out by the act, and, if approved, receive from the commission a certificate of public convenience, as provided by sections 18 and 19 of article V of the act.

11. All public service contracts are viewed in the light of having been made with an implied provision that the rate named therein is subject to change according to law, so as to keep it reasonable and nondiscriminatory.

12. While the rate may be changed, the other provisions of the contract remain in full force as against the parties thereto.

13. A change in a rate named in a contract of a public service company, so as to make it reasonable and nondiscriminatory, is not an impairment of the obligation of a contract.

14. In an action by a water company against a borough to recover for water furnished under a schedule of rates against which the borough had filed a complaint, still pending, the borough's contention that it may never be able, because of the company's insolvency, to be recouped of excess payments, will not be considered, if there is no allegation of present want of financial ability of plaintiff.

15. In such case the Supreme Court in reversing a judgment for defendant will direct that if a judgment is thereafter secured by plaintiff, and an application is made for a mandamus to enforce

payment thereof, such process will be under the control of the court.

Argued May 24, 1920.  Appeal, No. 70, Oct. T., 1919, by plaintiff, from judgment of C. P. Allegheny Co., April T., 1919, No. 1273, for defendant on question of law raised by affidavit of defense, in case of Suburban Water Company v. Oakmont Borough.  Before BROWN, C. J., STEWART, MOSCHZISKER, FRAZER, WALLING, SIMPSON and KEPHART, JJ.  Reversed.

Assumpsit for water supplied to borough.

Affidavit of defense in nature of demurrer.  Before CARPENTER, J.

The opinion of the Supreme Court states the facts.

The court entered judgment for defendant.  Plaintiff appealed.

*Error assigned* was sustaining demurrer and entering judgment, quoting demurrer, judgment and exception.

*John E. Laughlin* and *C. La Rue Munson,* of *Candor & Munson,* for appellant.—The legal effect of filing the rates was to supersede any previous contract between plaintiff and defendant: V. & S. Bottle Co. v. Mountain Gas Co., 261 Pa. 523; Leiper v. B. & P. R. R., 262 Pa. 328; Pittsburgh v. Pittsburgh Rys., 259 Pa. 558.

Every tariff filed becomes effective on the date named in the notice filed with the commission, which in the present case was April 1, 1918, and from that time the rates are collectible against every customer, domestic or municipal.

To say the contract between a public service company and a municipality must be made in the legal and ordinary way in which municipalities make contracts upon a competitive basis is in direct violation of the Public Service Law: Leiper v. B. & P. R. R., 262 Pa. 328; Union

Dry Goods Co. v. Georgia Pub. Service Corp., 248 U. S. 372.

When the rates are published they become established by law and cannot be varied by the parties, nor can the company depart from them.

The act takes the subject of rates out of the realm of ordinary contracts and places it upon the rigidity of a quasi-statutory enactment: V. & S. Bottle Co. v. Mountain Gas Co., 261 Pa. 523; Leiper v. B. & P. R. R., 262 Pa. 328, 336; Union Dry Goods Co. v. Georgia Public Service Com., 248 U. S. 372.

*L. K. Guiler* and *David L. Starr,* with them *Ernest E. Jones,* for appellee, cited: O'Malley v. Olyphant Boro., 198 Pa. 525; Carpenter v. Yeadon Boro., 208 Pa. 396; Phila. Co. v. Pittsburgh, 253 Pa. 147; Summit Hill School Directors, 258 Pa. 575; Dolan v. Schoen, 261 Pa. 11; Allegheny City v. Ry., 159 Pa. 411.

*Berne H. Evans,* with him *John Fox Weiss,* for Public Service Commission.

OPINION BY MR. JUSTICE KEPHART, June 26, 1920:

This is an action of assumpsit for water supplied to defendant borough. The Suburban Water Company, appellant, as a public service corporation, had furnished water to the borough for fire protection since 1893. It filed its schedule with the Public Service Commission March 1, 1918, which, after due advertising, was to become effective April 1, 1918. Appellee filed a complaint to the rates there set forth, but continued to receive and use appellant's commodity, and, when sued for the price thereof, refused to pay, setting up as a defense (1) that no contract with the municipality for this service had been approved by the Public Service Commission; and (2) that no contract had been secured as required by the borough code. A demurrer to defendant's statement having been filed, the court below, on consideration of

the matter, held the borough's position well founded and directed judgment to be entered in its favor; from this the Suburban Water Company has appealed.

The Public Service Act of 1913, in articles II and III, authorizes utilities to make and collect rates. By section 1, clause D, of article II, P. L. 1378, and section 54, of article VI, P. L. 1436, these utilities were required to file with the commission, on or before January 1, 1914, existing tariffs and schedules. It is not contended appellant did not comply with these provisions of the law, or that, on the date when the Public Service Act went into effect, it did not have on file its schedule of rates and existing contracts as therein required.

The Public Service Act permits changes to be made by utilities in existing tariffs and schedules, but to do so certain steps must be taken by the utility. Notice to the commission and the public must be given by posting or publishing the proposed change, "which shall plainly state the exact changes proposed to be made in the tariffs or schedules then in force, and whether an increase or decrease, and the time *when the proposed changes will go into effect.*" The schedule must be filed with the commission, posted and published, as indicated, for a period of thirty days, "in the manner, form, and places required with respect to the original tariffs or schedules": Article II, section 1, clause F. If the commission, or the public affected by the change of rates, is dissatisfied with the facilities, rules, regulations, practices, classifications, rates, fares, tolls, or charges, therein inaugurated, complaints may be filed against such changes and the matter will be determined as provided in sections 2, 3, 4 and 5, of article V, P. L. 1403-6. When complaint is made before the rate goes into effect, which is prior to the thirty-day period of filing and publication, the commission shall make due investigation in the manner particularly set forth in the act. It shall determine "as to the propriety of such proposed change and of the new rate, practice, or classification. After such hearing

and investigation, *whether completed before or after such* change goes into effect, the commission may make such order in reference to the new rate......as would be proper in a proceeding initiated after the same had become effective." On such hearing, where the proceedings have been instituted before the rate has become effective, the public service company must show the rates are reasonable, but when complaints are filed after the thirty-day period, the rates are prima facie reasonable and the burden of proof is on the complainants to prove them unreasonable. As said by Judge HEAD in B. & O. R. R. Co. v. P. S. C., 66 Pa. Superior Ct. 403, 406: "In other words, under such circumstances, the public service company is placed by the law in the position of a defendant in an ordinary action at law. He is not required to produce any evidence until the plaintiff has, prima facie, at least, offered proof which, if unanswered, would warrant a judgment in his favor." But whether the complaint is filed before or after the thirty-day period, if the utility has complied with the provisions of the statute, the rates become effective "at the time [fixed by the schedule in its notice of publication] when the proposed change will go into effect"; the effective date is the date made by the company when the proposed change of rates shall apply to its service, after being duly promulgated according to the statute. A rate becomes, on the effective date, an effective rate, and, as such, it is a collectible rate, or one that may be sued for. There can be no legal rate except the last tariff rate published as provided by law: Section 7, article III; section 1 (E and F), article II; section 41, article VI; and the effective rate thus published supersedes all prior rates covering the service therein called for.

The Public Service Law does not recognize any right to change a rate other than a published tariff rate, either in an individual or a municipality; the rate is at all times subject to the determination of the commission that it is just and reasonable, and it may be changed by

the utility in the manner prescribed by law. A conviction for charging a rate different from the tariff will be sustained, although the contract rate was the tariff rate at the time of the contract: Armour Packing Co. v. U. S., 209 U. S. 56, 81. One rate is to be changed and that is the one fixed and published in the manner pointed out in the statute and subject to change in the only way open by the statute: See I. C. C. v. Chicago & G. W. R. R., 209 U. S. 108. "When once lawfully published, a rate, so long as it remains uncancelled, is as fixed and unalterable, either by the shipper or by the carrier, as if that particular rate had been established by special act of Congress": C. R. R. Co. of N. J. v. Mauser, 241 Pa. 603, 606. The same may be said of rates of public utility companies of the State, filed and published as required by law.

Where rates have been complained against, either before or after they become effective, the commission has power, by general rule or special order, to require the utility to furnish its consumers or patrons a certificate or other evidence of "payment made by them in excess *of the prior established rate,"* and, upon petition after final order, may make a further order of reparation directing payment to the consumer of any damage sustained by him in consequence of the payment of any unjust or unreasonable rate. The utility, with the possible exception of three classes constituting special rates thus far very rarely in use in Pennsylvania, may not of its own motion have an affirmative order approving its rates; for nowhere in the act is such authority given. The act was intended to prevent ex parte approvals having the effect of contested approvals, and the only method to test the reasonableness of a rate is by complaint filed, as was done in this case, or by proceedings on the part of the commission of its own motion. While the investigation as to reasonableness of a rate under complaint is pending, "the rate to be charged......is the one fixed and published in the manner pointed out in

the statute and subject to change in the only way open by the statute": Armour Packing Co. v. U. S., supra. It is the effective, collectible and suable rate, duly published as required by the act, and remains as such, governing the charges to be made pending the investigation until the commission "shall determine and prescribe by a specific order the maximum, just, due, equal and reasonable rate......*to be thereafter established, demanded, exacted, charged or collected": Section 3, article V, supra. It is at this point, on petition for reparation, that any injustice done to consumers, pending investigation, may be worked out; but the proceeding throughout the act in this respect deals with the subject of rates and its allied practices and regulations. It does not deal with contracts.

It is contended, however, that, while this may be true as to domestic and industrial concerns, it is not true as to municipalities for the reason that the Borough Code, as amended by the Act of 1917, declares how boroughs may provide a supply of water, and that section 11, article III, of the Public Service Act, prescribes how contracts with municipalities may be made valid. The Borough Code specifically excepts provisions of the Public Service Act: "Nothing in this act shall be construed to repeal any of the provisions of the Public Service Law"; if it did not, what we later say on this subject in discussing section 11, article III, would apply. This section reads as follows: "No contract or agreement between any public service company and any municipal corporation shall be valid unless approved by the commission: Provided, that, upon notice to the local authorities concerned, any public service company may apply to the commission, before the consent of the local authorities has been obtained, for a declaration by the commission of the terms and conditions upon which it will grant its approval of such contract or agreement, if at all." This section does not control, for the following reasons: (1) The contract therein contemplated does not embody a charge for service fixed under an effective

rate; (2) by the terms of the Public Service Law, such rates have a legislative approval until, by the procedure therein determined, a different standard of charge shall be established. It will scarcely be contended a rate fixed for a given quantity of water, or service, is a contract, or that, when a consumer uses it, there is nothing more than a mere bargain and sale at a price fixed according to law. While the language of the first part of section 11 is quite broad, and ordinarily would include implied contracts, of which a bargain and sale may be said to be one, when it is read with the proviso that follows, it is clear it had no relation to such transaction or sale. How can a legislatively fixed rate be the subject of "terms and conditions," to receive the consent of the local authorities? When you read the first part of this section with the latter part (they must both have reference to the same character of contract), the use of the words "terms and conditions" shows that contract does not relate to a purchase of water, or the like, at a price fixed in the method prescribed by the act; but pertains to contracts involving more than rate fixing, contemplating such which require, in the exercise of a deliberate, discretionary power, the consent of the municipality, as, for illustration, contracts guaranteeing quantity, quality, time pressure, minimum requirement, to be paid for whether used or not, and many other matters where the rate may be the consideration. Rate making by a public service company involves no element of consent by a municipality when made; like any other consumer, it may file a complaint if aggrieved. The contracts mentioned in section 11 are such which must meet an investigation in the special manner pointed out by the act, and, if approved, receive from the commission a certificate of public convenience, as provided by sections 18 and 19 of article V, P. L. 1414 and 1415 of this act. "When application shall be made to the commission by any public service company for any approval under any of the provisions, of this act......such approval...... shall be given......when the commission shall find or

determine that the granting or approval of such application is necessary or proper for the service, accommodation, convenience or safety of the public." It is scarcely necessary to say that the approval of a rate is not necessary to any matter there mentioned.

Moreover, when a rate becomes effective, it is a rate established by law. It cannot be varied by the parties, and the company departs therefrom at its peril. Having satisfied every requirement of the act, it has become a collectible, suable rate until it is set aside in the method provided in the act. It is, therefore, for the time being, a legislative rate. It clearly was not the intention to include the "furnishing of all such service at prices, charges or rates" effective and collectible on all patrons alike, under the term "contract" as mentioned in section 11, article III, or to subject such legislative rate to a further revisory control in municipalities in that it must consent, thus tending to destroy the scheme of the act on this subject.

It was stated at the argument, and noted in the papers, this company had supplied the borough with water since 1893. It is entitled to the benefit of the presumption that all things were done as directed by law, and it would be fair to assume this furnishing was by a contract in existence when the change of rates was made in 1918; and, while we have held that the acts of public service companies, under the Public Service Law, supersede the acts of these companies with their patrons when they are in conflict, it is not exactly correct to say the entire contract is annulled. It may still be a contract between the parties, modified or enlarged by the acts of either the company or the commission, under the Public Service Law, and, if the consumer sees fit to recognize a change, it is still a contract. All public service contracts are viewed in the light of having been made with an implied provision that the rate named therein is subject to change, according to law, so as to keep it reasonable and nondiscriminatory at all times: Pinney & Boyle Co. v.

Los Angeles Gas & Electric Co., (Cal.) L. R. A. 1915 C. 282, 287, where it is stated that "it will be conclusively presumed that the parties contracted in contemplation of the power of the proper board or tribunal to fix the rate in every case where such power exists and may have been thereafter legally exercised": citing Louisville & N. R. Co. v. Mottley, 219 U. S. 467, 34 L. R. A. (N. S.) 671; Seattle v. Hurst, 50 Wash. 424, 18 L. R. A. (N. S.) 168; Portland R. Light & P. Co. v. R. R. Com., 56 Ore. 468; Knoxville Water Co. v. Knoxville, 189 U. S. 434; Buffalo East Side R. R. Co. v. Buffalo Street R. R. Co., 111 N. Y. 132, 2 L. R. A. 384. All the remaining provisions of the contract remain in full force as against the parties thereto: State v. Tampa Water Works Co., 56 Florida 858, 874, 19 L. R. A. (N. S.) 183, 189, 190. Invalidity in part does not make the whole contract invalid: Winsor v. Com. Coal Co., 63 Wash. 62, 33 L. R. A. (N. S.) 63; Packard v. Byrd, 73 S. C. 1, 6 L. R. A. (N. S.) 547; Central N. Y. T. & T. Co. v. Averill, 199 N. Y. 128, 32 L. R. A. (N. S.) 494; the same rule was applied to a bill of lading where a part of it became invalid by operation of law: Whitnack v. C., B. & Q. Ry. Co., 82 Neb. 464, 19 L. R. A. (N. S.) 1011; and where passes have been declared illegal the carrier which had agreed to give them in consideration of the granting of the right of way was permitted to retain the fruits of the contract: Cowley v. N. P. Ry. Co., 68 Wash. 558, 41 L. R. A. (N. S.) 559; the same rule was applied to a contract with a gas company: Birmingham, etc., Co. v. R. C. Pratt (Ala.), L. R. A. 1915 A. 1208.

The reason for this rule is simple, as shown by the many cases which hold that the change of a rate fixed by contract for the performance of service by a public utility company does not impair the obligation of the contract under the Constitution of the United States, and, if it did, the change would be unlawful: Pinney & Boyle Co. v. Los Angeles Gas & Electric Co., L. R. A. 1915, C. 282, 287; Knoxville Water Co. v. Knoxville, 189

U. S. 434; New Orleans v. New Orleans Water Works Co., 142 U. S. 79; Wyandotte County Gas Co. v. Kansas, 231 U. S. 622; Benwood v. P. S. C. (W. Va.), L. R. A. 1915, C. 261, 273; Browne v. Turner, 176 Mass. 9; Union Dry Goods Co. v. Georgia Pub. S. Corporation, 83 S. E. 946, 248 U. S. 372; Portland R. L. & P. Co. v. Portland, 200 Federal 890; Bullard v. Northern Pacific Ry. Co., 10 Mont. 168; Southern Wire Co. v. St. Louis Bridge & Tunnel R. R. Co., 38 Mo. App. 191; Fitzgerald v. Grand Trunk R. R. Co., 63 Vermont 169; and see Foltz v. P. S. C., 73 Pa. Superior Ct. 24. The contract is simply modified or reformed so as to include for the time being the new rate fixed by law. The power to reform contracts of this kind was granted under the Act of 1874, giving the courts jurisdiction over rates: Turtle Creek Borough v. Penna. Water Co., 243 Pa. 401, 408; and see a learned discussion of the effect of the Turtle Creek case in S. P. Ry. Co. v. S. V. Water Co., L. R. A. 1917, E. 680, 684.

Our own cases and those from other jurisdictions throughout the United States hold the change in rates, so as to make them reasonable and nondiscriminatory, is not an impairment of the obligation of a contract to be performed by a public utility company. It is beyond the power of the contracting parties to fix the rates permanently, and the contract remains in full force and effect, binding on both parties as long as the obligation is unimpaired. See opinion of Chief Justice BROWN, Scranton v. P. S. C., 268 Pa. 192, for a discussion of the theory upon which this principle rests.

The cases of V. & S. Bottle Co. v. Mountain Gas Co., 261 Pa. 523; Leiper v. B. & O. R. R. Co., 262 Pa. 328; and Central R. R. of N. J. v. Mauser, 241 Pa. 603, do not in any way affect the conclusion just reached. In these cases this court held that an illegal rate could not be enforced, and decided nothing inconsistent with our present decision. These rulings are in perfect accord with the cases cited, supra. If they are to be construed to support a position that the whole contract is invalidated by

the change of rate, then the obligation of the contract is impaired and the change of the rate is unconstitutional. There is, however, no impairment of the obligation but merely a fixing of the rate to be charged for the service, which rate could only be legally fixed by the parties so long as it was not fixed by the sovereign power of the Commonwealth, and the parties are presumed to have included this provision in their contract.

But whether there was, or was not, a contract, under the Public Service Act, when the company has changed a rate in accordance with the provisions of the law, that rate, on the day advertised, is an effective rate, suable and collectible, and it is not governed or controlled by section 2 of article III. But, it has been said, if we permit public service companies to collect rates which may thereafter be determined unreasonable, the interests of the municipality may be jeopardized, as may its other patrons, in that they may never be able, because of the company's insolvency, to be recouped of excess payments thus made. As the case is now presented, it is sufficient for us to say there is no allegation that this company is not financially responsible for any damages occasioned by the excess payments. Under the very broad powers given to the commission by section 27, of article V, the commission may enforce, execute and carry out, by its order, all the provisions of the act relating to the duties and limitations of public service companies, including the obligation to make reparation, and no court would think of declaring an act of the commission unjust and unreasonable which would require from a public service company, subject to the commission's approval, a bond to indemnify its patrons against loss where there is danger of the company's insolvency. We propose to apply the spirit of such an order in this case. The court below was in error in holding that the Borough Code and section 2, of article III, controlled the questions before it.

The judgment of the court below is reversed and it is directed that judgment be entered for plaintiff unless defendant shall within ten days file an affidavit of defense to the merits of the claim, if any they have. If, upon any judgment secured by plaintiff, there is an application for a mandamus execution to enforce payment, this process will be under the control of the court.

Appellee to pay the costs.