## Zeuger Milk Co. v. Pittsburgh School District

*Brasley, Rubin, Balter & Cole*, for plaintiff.
*Nicholas R. Criss*, for defendant.

EGAN, J., February 4, 1937.—Plaintiff's action is in assumpsit, to which defendant has filed an affidavit of defense raising questions of law. The statement of claim contains averments that on December 21, 1933, plaintiff and defendant entered into a written contract whereby plaintiff was to supply milk to defendant for the year 1934. The exact nature of that contract cannot be determined from the pleadings. The plaintiff has attached exhibit A to its statement of claim as the alleged contract, but it appears that exhibit A is a letter from defendant's superintendent of supplies, notifying plaintiff that defendant had awarded the contract to plaintiff for milk for the year 1934.

Inasmuch as defendant does not rule plaintiff for a more specific statement of claim, we will assume an existing contract requiring plaintiff to supply milk to the several public schools of the City of Pittsburgh during the year 1934 and that plaintiff has fully performed its contract

and made all deliveries as requested. The writing, exhibit A, shows that plaintiff was to furnished milk at two cents less per quart and two cents less per half pint than the wholesale price. Plaintiff avers the delivery of a large amount of milk as required and directed by defendant, and also avers the enactment of the Milk Control Board Law on January 2, 1934, P. L. 174, and that from "April 7, 1934, the prices charged were the minimum prices fixed in the official orders by the Milk Control Board of the State of Pennsylvania at which milk dealers could lawfully sell milk of the class sold and delivered by plaintiff to said defendant, as provided by the Act of January 2, 1934, P. L. 174." On and after April 7, 1934, to and including December 31, 1934, plaintiff continued to furnish milk, but charged the same at the minimum price fixed by the Milk Control Board, and now sues to recover $16,112.64, being the difference between the figures agreed upon in the contract and the minimum prices fixed by the Milk Control Board.

No question is raised by defendant concerning these alleged orders of the board, so that we assume they were properly and legally issued and that they apply to the sale and delivery of milk from April 7, 1934, to December 31, 1934, and that the schedule of prices so fixed provided for higher prices than those contained in the contract of December 21, 1933.

The Milk Control Board Law was before the Superior and Supreme Courts of our State in Rohrer v. Milk Control Board, 121 Pa. Superior Ct. 281, 322 Pa. 257. The Superior Court held the act unconstitutional, with a dissenting opinion filed by President Judge Keller. The Supreme Court reversed the decision of the Superior Court and adopted the opinion of President Judge Keller as the law of this State, with Justices Schaffer and Drew dissenting. In holding the act constitutional, the court says, in the language of President Judge Keller, at page 316:

"It seems clear to me that . . . a statute regulating the modern milk industry is not violative of that constitutional provision; in view of the fact that it is a unique and basic industry absolutely necessary for the health and well being of the whole people and there is just ground for the enactment of the statute in the depressed condition of the productive end of the industry, with the reasonable expectation that if it continues it will result in widespread harm and injury to the general public. Certainly there is nothing fixed and static about the industries or businesses which may be regulated in the public interest, in the exercise of the police power of the State."

It is a well-known principle that property rights and contract rights are not absolute, and the people, through the legislature, have the power to regulate contract rights if the regulation is under the police power of the State and for the public interest. The right of contract is not an unlimited or unbridled privilege, but is a right subordinate to a legislative enactment which has for its object the comfort, safety and welfare of the public.

The production, distribution and sale of milk constitute matters of public interest, concerning not only those engaged in the milk industry, but the public in general, and therefore the milk industry is subject to regulation and control by the legislature: Rohrer v. Milk Control Board, supra.; Nebbia v. New York, 291 U. S. 502; State of New Jersey, ex rel., v. Newark Milk Co., 118 N. J. Eq. 504; Franklin v. State, ex rel., (Ala. 1936) 169 So. 295; Miami Home Milk Producers Assn. v. Milk Control Board, (Fla. 1936) 169 So. 541; Reynolds et al. v. Milk Commission of Virginia, 163 Va. 957.

Defendant contends that the act was not intended to govern contracts executed prior to its passage. As a general proposition in construing statutes legislation must be considered as addressed to the future and not to the past, and a retrospective operation will not be given to a statute which interferes with antecedent rights or by which

human action is regulated. In support of this principle defendant cites Barnesboro Borough v. Speice, 40 Pa. Superior Ct. 609; Wettengel v. Robinson et al., 300 Pa. 355; Brubaker's Estate, 59 Pa. Superior Ct. 109; but these cases do not deal with statutes enacted for the public interest under the police power of the State.

There is also "a well recognized principle of law that all contracts are made in subordination to a prospective exercise of the police power within legitimate limits by the state": Burke et al., to use, v. Bryant et al., 283 Pa. 114. In State of New Jersey, ex rel., v. Newark Milk Co., supra, the court said, at page 519:

"We have lately affirmed the doctrine that these constitutional guaranties of the right of property and individual freedom of contract must yield to the common good and general welfare. The police power extends to all the great public needs; all personal as well as property rights are held subject to this reserve element of sovereignty. Changing conditions necessarily impose a greater demand upon this reserve power for such reasonable supervision and regulation as may be essential for the common good and welfare. The economic interests of the state may justify its exercise, notwithstanding that the expedient resorted to invades the domain of property rights or of contract; generally, it may be exerted whenever necessary for the preservation of the public health, morals, comfort, order and safety."

In Beaver County B. & L. Assn. v. Winowich et ux., 323 Pa. 483, the Deficiency Judgments Act of January 17, 1934, P. L. 243, was declared unconstitutional in that it violated article I, sec. 10, of the Constitution of the United States, and article I, sec. 17, of the Constitution of Pennsylvania, being a statute which impaired the obligation of a contract made prior to the passage of the act. It is to be noted however that in stating the opinion of the court Mr. Justice Stern, at page 511, says:

"It is true, generally speaking, that the obligations of contracts cannot be allowed to impede the exercise of the police power, which is always paramount . . . It is also true that the original conception of the police power, which confined it to the protection of public health, safety and morals, has broadened so as to include many phases of the general welfare which, in earlier periods of constitutional history, would not have been deemed to be within its scope . . . To reduce the obligations of debtors on judgments in personam cannot be said to be an exercise of the police power."

"If the exercise of the police power should be in irreconcilable opposition to a constitutional provision or right, the police power would prevail": Commonwealth v. Widovich et al., 295 Pa. 311, 318.

"The constitutional protection of the obligation of contracts is necessarily subject to the police power of the state, and therefore a statute passed in the legitimate exercise of the police power will be upheld by the courts though it incidentally destroys existing contract rights, and this applies to contracts made with the state as well as to contracts between individuals. All contracts made with reference to any matter that is subject to regulation under the police power must be understood as made in reference to the possible exercise of that power, because, if the legislature had no power to alter its police laws when contracts would be affected, then the most important and valuable reforms might be precluded by the simple device of entering into contracts for the purpose of doing that which otherwise might be prohibited": 6 R. C. L. 347, sec. 341.

Every contract is entered into subject to an implied limitation that a proper exercise of the police power of the State may affect it. Not only are existing laws read into contracts, but the reservation of essential attributes of sovereign power is also read into contracts: Home B. & L. Assn. v. Blaisdell et al., 290 U. S. 398.

By analogy, decisions under The Public Service Company Law hold that these contracts are made and entered into in subordination to a prospective exercise of the police power within legitimate limits by the State. In Springfield Consolidated Water Co. v. Philadelphia, 285 Pa. 172, the Supreme Court states:

"A contract that provides for free or maximum price service relates entirely to the commodity sold, whether it be water, light, passenger traffic or other public service. The State, in the exercise of its police power, may regulate such contracts. It may modify their terms and substitute a reasonable rate of charge,—one that is equitable and just to the utility and all consumers: Scranton v. Public Service Commission, 268 Pa. 192. This is the rule although the contract for free or maximum rates be made under a provision of the Constitution, where that provision comes in contact with the police power of the State exercised within specified limits for the public good in each particular community. The police power in this aspect is supreme. . . .

"This State has held that no contract, private or municipal, can be made beyond the reach of regulation because of article XVI of the Constitution relating to nonabridgment of the police power."

Generally to the same effect are American Aniline Products, Inc., v. Lock Haven, 288 Pa. 420; State Line & Sullivan R. R. Co. v. Lehigh Valley R. R. Co., 277 Pa. 227; Duquesne Light Co. et al. v. Public Service Comm. et al., 273 Pa. 287; City of Scranton v. Public Service Comm. et al., 268 Pa. 192; Suburban Water Co. v. Oakmont Borough, 268 Pa. 243.

The contract in question was entered into by the parties in subordination to the police power existing in the legislature to regulate the price of milk in the public interest. Defendant continued to order and receive milk after the passage of the act and the adoption of orders by the Milk Control Board effective April 7, 1934, and after being

charged for the same at the officially fixed prices. Defendant became bound under the law to pay for all milk ordered and received after April 7, 1934, at the prices fixed in the official orders of the Milk Control Board. In defendant's brief counsel contends:

"It [plaintiff] continued the delivery of milk as if the Milk Control Board Law had never been passed and then billed the milk at the board price. When defendant deducted the two cents per bottle in accordance with the terms of the contract, and remitted the balance, plaintiff still continued to deliver the milk during the entire year without negotiating a new contract or securing any consent from defendant to the change in price."

Plaintiff was under no duty to secure a new contract, and its billing to defendant after April 7, 1934, put defendant upon notice that plaintiff considered its contract modified by the provisions of the act and the official orders of the board. Defendant's action in continuing to order and receive milk after such orders and notice made it subject to pay for such milk at the legally fixed prices.

## Order

And now, February 4, 1937, the questions of law raised in the affidavit of defense are decided in favor of plaintiff and against defendant, with leave to defendant to file an affidavit of defense in 15 days.