[No. 38146.   En Banc.   May 19, 1966.]

THE CITY OF TUKWILA, *Respondent*, v. THE CITY OF SEATTLE, *Appellant.*\*

*A. L. Newbould, Arthur T. Lane*, and *Jorgen G. Bader*, for appellant.

*A. Wesley Hodge* (of *Hullin, Ehrlichman, Carroll & Roberts*), for respondent.

HALE, J.—Seattle and Tukwila, as old friends are wont to do, had a falling out. Tukwila enacted two ordinances reducing 85 to 90 per cent the franchised area served by Seattle City Light, thereby leaving Seattle City Light with 10 to 15 per cent of the area and Puget Sound Power & Light Company with 85 to 90 per cent. Seattle claims this to be a unilateral, unconstitutional impairment of its franchise and appeals the decision of the superior court upholding the ordinances. We would have an easier time of it were

*Reported in 414 P.2d 597.

the record not so replete with nostalgic but diverting references to the growth and development of Seattle's hydroelectric system.

The legal conflict came about in this way. In 1916, the town of Tukwila granted to the Puget Sound Power & Light Company a 50-year franchise to use the streets and public areas of Tukwila for the transmission, distribution and sale of electricity within the town's geographical limits. Forty-two years later, October 6, 1958, by ordinance No. 262, Tukwila awarded the city of Seattle a similar franchise, neither being exclusive of the other. Seattle formally accepted this franchise by ordinance and assumed the duties, responsibilities, privileges and rights of a public utility, undertaking to provide electrical service to all customers applying for it within the city limits of Tukwila. Under the franchise agreement, Seattle agreed to pay to Tukwila an annual franchise fee of $5,000, increasing gradually during the franchise term to $15,000 annually, and totaling $500,000 during the entire franchise period.

There were, of course, many reasons for Tukwila to grant Seattle the franchise. Among them was the fact that, in 1958, Tukwila had annexed an area peculiarly suitable for commercial and industrial use known as the Andover-South Center tracts. The town council contemplated that two corporations, Andover Industrial Park, Inc., and South Center, Inc., would create an industrial and commercial district there. Seattle, during 1959 and 1960, to carry out its franchise and mindful of this impending industrial and commercial growth and probable population increase in Tukwila, purchased a substation site for $175,000, expended $200,000 for filling and grading, additional sums for a right of way to this site, and proceeded with the engineering work essential to the whole scheme.

Meanwhile, Puget Sound Power & Light Company, through its subsidiary corporation, Puget Western, Inc., bought the Andover Industrial Park, consisting of about 325 acres of industrial and commercial sites, with intent to supply electrical service to industrial plants which might locate there.

For reasons not made entirely clear in the record, but ostensibly to assure greater safety to its residents, Tukwila enacted ordinances Nos. 353 and 364, the ordinances in issue, apparently designed to prevent duplication of service by Puget Sound Power & Light Company and Seattle City Light within the same areas. Under these ordinances, Seattle would have exclusive right to transmit and distribute electricity within one described zone and Puget Sound in the other with neither having the right to serve customers in the area allotted to the other. On a geographical basis, Seattle would serve 10 to 15 per cent of Tukwila's area and Puget Sound 85 to 90 per cent.

Contending that the ordinances, 353 and 364, and the enforcement thereof constitute an unconstitutional and, therefore, void impairment of its franchise to distribute electricity throughout the entire city of Tukwila, the city of Seattle urges this court to declare them unconstitutional and void. Tukwila, however, contends that it possesses the police power to reduce the hazards of electrical distribution, including those arising from wind, snow and ice, by eliminating the duplication of electrical facilities between competing utilities. It claims that segregating the town into exclusive districts for electrical service lessens the danger from transmission and distribution of electricity, and thus falls within its police power to provide for the safety of its residents. It points also to the trial court's finding No. 3, "That duplication of electrical facilities under the modern concept of economics is not in the best interests of the City of Tukwila and they will be better served by one utility in a given area rather than by two competing electrical utilities," as an additional factor to be considered in determining the extent of the city's police power.

An avowed intention by Seattle to supply energy to a customer triggered this case. In September, 1960, the N. C. Machinery Company acquired land within the limits of Tukwila in an area then having no electrical service but which fell within the district reserved exclusively for Puget Sound Power & Light Company under ordinances 353 and 364. N. C. Machinery Company began construction of an

industrial building, and, in June of 1964, applied to Seattle City Light for 5 years' electrical service.

On the basis of estimated demands for energy predicted at 1,100,000 kilowatts annually, Seattle's engineers computed that N. C. Machinery Company would pay $9,600 per year for electricity to Seattle as contrasted with $14,900 to Puget Sound Power & Light according to the publicly posted rate schedules. Anticipating, too, that the N. C. Machinery Company needed more energy than originally contemplated because of a later decision to air condition its building, the engineers calculated the new load at a total of 2,000,000 kilowatt hours annually, costing $14,000 from Seattle and about $20,000 from Puget Sound, based on the same rate schedules. On Seattle's insistence of the right to furnish N. C. Machinery Company with electrical power, notwithstanding ordinances 353 and 364 which put the customer within Puget Sound Power & Light Company's exclusive territory, Tukwila brought this action for an injunction. From a decree of injunction, Seattle appeals.

The evidence concerning the rates of both utilities is undisputed for they are published and available at all times for inspection. Unless the payment of taxes by a public utility to a municipal corporation is one of the factors warranting an exercise of the police power, we see no way in which the city of Tukwila can look to the economics of the matter in support of its exercise of the police power, and no authority has been shown in sustaining that proposition. Therefore, an assertion, valid or otherwise, that the private utility will pay more into Tukwila's treasury than a publicly owned one cannot be a basis for the police power in prohibiting the latter. We must, thus, look solely to the safety features claimed as a basis for the ordinance.

We are of the opinion that the enactment and enforcement of Tukwila's ordinances Nos. 353 and 364 limiting Seattle in the exercise of its electrical franchises to a part of the city's area constituted an unwarranted and unconstitutional impairment of Seattle's franchise and one not to be countenanced as an exercise of the police power to protect the citizenry from the dangers of electrical trans-

mission and distribution. There was no claim here that Seattle has not or will not comply fully with all state safety regulations and rules or those of Tukwila pertaining to the generation, transmission and distribution of electrical energy or the construction and maintenance of all related facilities. Tukwila's claim of lessening the hazards is based solely on the idea that the dangers increase whenever the two utilities have duplicate poles and wires in the same areas serving different customers. On this point, the record elicits a goodly quantum of nostalgia concerning the growth of Seattle City Light in the day when J. D. Ross, internationally famous in the field of hydroelectric power, directed the destinies of Seattle's hydroelectric system, and Puget Sound Power & Light and City Light had duplicate systems operating in Seattle with neither utility claiming the duplication as an unreasonable source of danger.[1]

By the terms of its franchise granted in 1958 under Tukwila ordinance 262, as accepted by Seattle in its ordinance No. 87631, Seattle acquired the right to use the streets and public areas of Tukwila for the transmission, distribution and sale of electrical energy throughout the entire area within the city's corporate limits. By the terms of ordinances 353 and 364 in 1962, Tukwila totally bars Seattle from exercising the franchise in 85 to 90 per cent of that city's geographical area.

Franchises, whether statutory or by ordinance, have the legal status of contracts, binding with equal force, according to the terms thereof, upon the granting authority and the granted entity. 5 McQuillin, Municipal Corporations §§ 19.39, 19.40 (1949). The performance of all contracts falls within and yields to the police power if it be reasonably exercised to the attainment of reasonable ends. Even though such regulation tends to impair the obligation

---

[1]"THE COURT: I am remembering the days of the battle in Seattle when everybody wanted to run for the City Council. If he happened to have Puget Power in his home, he always switched to City Light before declaring his candidacy. MR. LANE: I don't know what the situation is in Tukwila. It may be the reverse of that. MR. HODGE: They'd rather switch than fight. THE COURT: Those were the days J. D. Ross was being considered for canonization."

arising from the contract or to increase the burdens of its performance, the police regulation will not be voided by the courts unless it be unreasonable or there be no rational connection between the end to be achieved and the regulations by which it is sought to be accomplished.

We said in *Tacoma v. Boutelle*, 61 Wash. 434. 440, 112 Pac. 661 (1911):

> [T]he question [is] whether such specific requirement is reasonable. If so, it will be sustained; if not, it will be held invalid. Elliott, Railroads, 1624. And "the question of reasonableness usually resolves itself into this: Is the regulation carried to a point where it becomes prohibition, destruction, or confiscation." Freund, Police Power, 61.

Again, in *Washington Natural Gas Co. v. Seattle*, 60 Wn.2d 183, 373 P.2d 133 (1962), a case not directly involving the police power but concerned similarly with impairment of franchise rights, this court held that the gas company had no right to compensation for the necessary restoration of its facilities required by improvement to the streets and highways, saying:

> There is nothing to indicate that plaintiff is now unable to furnish gas to any of its customers under the terms of its franchise. The conclusion is inescapable—this was a removal of public utility facilities from certain portions of public streets and a relocation of the facilities in order that the Alaska Way viaduct could be built and the purpose of the franchise could be continued.

We said further in that case:

> In the case before us, plaintiff did not have a property right in a fixed location. Its franchise right ". . . to lay and extend gas pipes and apparatus for the conveyance of gas throughout all the streets . . ." has neither been damaged nor destroyed . . . . .

We think the doctrine well stated in Rhyne, Municipal Law § 24-6 (1957):

> A grant, franchise, easement or other right accorded to a utility company by public authority, to maintain structures in public streets, is at all times subject to the police power of the sovereign, and unless expressly agreed to otherwise in the franchise, the company must, at its own

expense, make such changes as the public convenience and necessity require, and it is bound to alter, remove, relocate, support and maintain a structure, when necessary for the city's carrying out a function in the interest of public health, safety or welfare . . . .

We observe that the city of Tukwila has ample authority under its police power to make reasonable provisions for the protection of the public and to maintain high but uniform standards of safety in the transmission and distribution of electricity within its boundaries by imposing safety regulations which, although protecting, fall short of prohibiting the exercise of the powers granted in the franchise. If the city believes that Puget Sound Power & Light Company and Seattle City Light pursue practices increasing the hazards of electrical distribution, it may, by the adoption of the uniform rules applicable to all public utilities within its boundaries, legislate directly against the hazards feared.

This case, however, does not involve legislation designed to increase the safety factors or limit the dangers. It does not involve an electrical safety code, nor prescribe minimal standards for equipment, construction and safety devices but, instead, prohibits the exercise of the franchise in a substantial area of the franchised territory. It prohibits rather than protects. It substitutes for a reasonable regulation the truism that, if one electrical wire is dangerous, two will be twice as hazardous. A reasonable exercise of the police power would make both wires safe and yet allow each to carry on its legitimate function. If the truism were held to establish the basis in law for sustaining the two ordinances, then, of course, Tukwila could, under a logical extension of this principle, forbid all transmission of electricity within its borders on the theory that electricity creates more hazards than the kerosene lamps it replaced.

Article 1, § 23, of the Washington State Constitution, forbids the accomplishment of what ordinances 353 and 364 will do directly—impair the obligation of a valid and subsisting contract. The constitution declares:

No bill of attainder, ex post facto law, or law *impairing the obligations of contracts* shall ever be passed. (Italics ours.)

The ordinances, prohibiting as they do the rights granted in the franchise to use Tukwila's streets, alleys and public areas for the transmission, distribution and sale of electrical energy throughout a substantial part of the franchised area, impair the obligations of a valid contract and, thus, constitute an unconstitutional and void impairment of the city of Seattle's franchise. The ordinances are, therefore, held to be of no force and effect.

The cause is reversed with directions to dismiss the case and vacate the injunction.

ALL CONCUR.