[No. 42001.    En Banc.    November 16, 1972.]

FERRIS F. KETCHAM *et al., Respondents,* v. KING COUNTY MEDICAL SERVICE CORPORATION *et al., Respondents,* WASHINGTON OPTOMETRIC ASSOCIATION *et al., Appellants.*

*Asmundson, Rhea & Atwood* and *David E. Rhea,* for appellants.

*Fred H. Dore* and *Joseph O. Masterson,* for respondents.

HALE, J.—A hallmark of our times is the growth of prepaid medical service and health care programs throughout the country. These programs usually arise out of contract among doctors, hospitals, pharmacists, subscribers and administrators and sometimes include other licensed practitioners of the healing arts such as optometrists, chiropractors and podiatrists. In 1969, the legislature enacted Laws of 1969, ch. 143, p. 504 (RCW 48.44.025), which provided that, if a patient subscribing to any such plan in this state received vision care from a licensed optometrist, the medical service program of which the patient is a member must reimburse the patient for the optometrist's fee even though such optometrist—or any other optometrist—is not a contracting participant in the program.

Plaintiffs, five licensed medical doctors specializing in the

practice of ophthalmology, and participants in prepaid medical and health care programs in this state, brought this suit to have the optometrist reimbursement statute (RCW 48.44.025) declared unconstitutional as one depriving them of property without due process of law and impairing their rights of contract. From a decree holding the statute unconstitutional, the Washington Optometric Association and Donald B. Hanford and Emery Sigeti, licensed and practicing optometrists, appeal.

Plaintiff ophthalmologists, practicing in the Seattle area, specialize in all aspects of treating eye disease and conditions. They diagnose, perform surgery, administer drugs, medicines and chemicals, prescribe and fit glasses and other devices, and, in short, do and perform all medical services necessary to the complete medical care of human vision. They brought this action on behalf of all ophthalmologists as a class practicing in this state, and designated the named health care service organizations, The Washington Optometric Association and the two individually named practicing optometrists, Doctors Donald B. Hanford and Emery Sigeti, as defendants.

Defendant health care service contractors, such as King County Medical Service Corporation and the other named health care contractors, are regulated by the health care services act, RCW 48.44, which provides in RCW 48.44.010:

> (1) "Health care services" means and includes medical, surgical, dental, hospital and other therapeutic services. The services of an optometrist licensed by the state of Washington and the services of a pharmacist registered by the state of Washington are also declared to be health care services for the purposes of this chapter.

There are, of course, many variations in the contract terms among the different health care service contractors, medical doctors, hospitals, clinics and subscribers. But in general, the subscriber pays monthly premiums to the health care service contractor who in turn contracts with participating doctors, hospitals and pharmacists to furnish medical, surgical and hospital care to the subscribers and

their dependents, the bills for which are paid, according to the contract, by the health care service contractor. The contract may include, depending upon its terms, dental care, physical and occupational therapy, psychiatric services, optometrists, and such other kinds of therapy as are licensed by the state and agreed to by all of the parties to the plan, but subject to the lawful regulation by the state. The plans are essentially voluntary and based upon freedom of contract by all participating parties, organizations and institutions. It is the claimed impairment of that freedom which gives rise to this case.

In 1969, Laws of 1969, ch. 143, p. 504, the legislature, while prohibiting advertising, enacted the reimbursement provision as follows:

> Whenever a health care service contractor has entered into an agreement with his subscribers for vision care, and this service is performed by a licensee under chapter 18.53 RCW, who is neither a health care service contractor nor a participant, then reimbursement or indemnity shall be provided the persons paying for this service in the same amount as that given to a participant.

This is the provision which the trial court held to be unconstitutional as one impairing the obligation of contract. The court granted plaintiffs an injunction restraining defendant health service contractor from expending money paid into the plan by subscribing members for optometrists' fees under this statute.

The constitutions deal explicitly with freedom of contract:

> No state shall . . . pass any bill of attainder, ex post facto law, *or law impairing the obligation of contracts* . . .

(Italics ours.) U.S. Const. art. 1, § 10.

> No bill of attainder, ex post facto law, *or law impairing the obligations of contracts shall ever be passed.*

(Italics ours.) Const. art. 1, § 23. While recognizing the viability of these provisions, defendants contend that the freedom of contract must give way at times, and in this

particular instance, to the overriding police power of the state.

■■   There is little doubt that the police power may be applied to protect the public health and safety. *State ex rel. Rhodes v. Cook,* 72 Wn.2d 436, 433 P.2d 677 (1967), *appeal dismissed,* 392 U.S. 643, 20 L. Ed. 2d 1347, 88 S. Ct. 2281 (1968). In the exercise of the police power, as an attribute of sovereignty, the state may, to promote the public welfare and safety and to safeguard life, health, property and morals, regulate businesses, professions and callings. *Creelman v. State Bd. of Registration for Architects,* 73 Wn.2d 298, 438 P.2d 215 (1968); *Reesman v. State,* 74 Wn.2d 646, 445 P.2d 1004 (1968). Because the protections are broad, the police power is to be broadly construed. If a state of facts justifying the legislation in question reasonably can be conceived to exist, then it will be presumed that such facts exist and the legislation will be sustained. *State v. Laitinen,* 77 Wn.2d 130, 459 P.2d 789 (1969).

But we are confronted here not directly with the public peace, welfare, health and safety, for the health care services act in particular (RCW 48.44) and the insurance code in general (RCW Title 48) have already entered the field and comprehensively covered the subject of health care service contracts and statutes adopted prescribing minimum standards of education, training and proficiency for the practice of the various healing arts. The instant case deals with none of these standards but arises from an amendment to existing legislation, and has nothing to do with the qualifications to practice the healing arts or the standards for such practice. It is an amendment which appears prima facie to affect fiscal matters only and thus to impair the obligation of existing contracts, and burdens the right to extend such contracts in the future. It appears to have been enacted not in the interest of regulating a profession or calling, or affecting the standards for the practice of medicine or the operation of hospitals or the practice of optometry, but to provide a financial indemnity to one

branch of the healing arts at the expense of other contracting parties.

We are dealing with a right particularly enumerated in the constitution—the freedom to contract. By obligation of contract is meant "The law binds [the parties] to perform [their] undertaking." *Sturges v. Crowninshield,* 17 U.S. (4 Wheat.) 122, 4 L. Ed. 529 (1819). Neither the due process clause nor the impairment of contract clause of either constitution overrides the power of the state to establish regulations that are reasonably necessary to secure the health, safety, good order, comfort or general welfare of the community. 16 C.J.S. *Constitutional Law* § 281 (1956); 16 Am. Jur. 2d *Constitutional Law* § 289 (1964). But the test is one of reasonableness. If the obligation of contract is to be impaired by the exercise of the police power, there must be a rational connection between the accomplishment of the purpose and the means employed. In directing that subscribers, *i.e.*, patients, shall be indemnified by the medical service corporations for the fees paid to optometrists for vision care, the statute not only impairs the contract between the subscribers or patients and the medical service corporations, but the obligations among participating hospitals, physicians, and medical service corporations as well, and additionally against their will compels the ophthalmologists and hospitals to practice in a professional association with the optometrists on pain of either participating in this new legislatively ordained arrangement or withdrawing from the existing contract.

In their testimony, the ophthalmologists implied that they regarded the freedom of contract as a component of the right to practice medicine and surgery under the licensing power of this state; unless the police power is of overriding import, they would decline to participate in professional association with optometrists. They contend that the statute compelling them to do so not only takes their property without due process of law and impairs the obligations of their contracts but will weaken the financial status of

prepaid medical programs and lower the standards of eye care in this state.

A composite of their testimony shows, we think, that ophthalmologists, who limit their practice to the examination, treatment and surgery of the eye, each examine or treat between 5,000 and 6,500 patients annually, and those ophthalmologists whose specialization includes ear, nose and throat see about 3,000 eye patients a year. The ophthalmologists who participate in a program of prepaid medicine insist upon doing eye examinations and uniformly perform them when fitting glasses. They attach greater importance to the eye examination than to the refraction. Thus, in conducting refraction tests for fitting glasses, the ophthalmologist not only examines the patient's eyes for disease, abnormalities and deterioration, but also for signs of other diseases not directly involving care and treatment of the human eye. In the course of a year, they discover and begin early treatment, they say, of many serious eye diseases which only an ophthalmologist would likely discover and only an ophthalmologist by law can heal; and they detect and refer to other medical specialists for early treatment or hospitalization diseases and bodily conditions not directly included in eye care.

One ophthalmologist testified that he regularly finds on an average of four or five patients a year suffering from pathological conditions whose eyes have been refracted by optometrists but who were not referred to ophthalmologists for eye care. These patients had such diseases and conditions as cataracts, glaucoma and retinal detachment. An optometrist, say the ophthalmologists, is not authorized to use drugs for dilation of the eye, and no matter how highly trained an optometrist may be, he will be unable to detect many diseases of the eye without dilating the pupil with eyedrops. Without dilation with drugs, glaucoma and other diseases and many tumors cannot be seen unless the symptoms appear centrally located, that is, opposite the pupil. Among the diseases and bodily conditions that the ophthalmologists may detect in a routine eye examination made in

conjunction with doing an eye refraction for glasses are brain tumors, arteriosclerosis, tuberculosis, diabetes, chorioretinitis, glaucoma, retinal detachment, iritis, retinal sarcoidosis, fat embolic presence and choroideal nerves, all of which usually demand immediate medical treatment. One ophthalmologist in the course of his testimony exhibited a microscopic slide showing a tumor of the eye which revealed a primary cancer lesion of the breast. To detect these diseases by means of an eye examination, the ophthalmologists agreed, requires a dilation of the pupil; this, they say, can be done properly only by means of drugs. Treatment of the diseases of the eye requires both medicine and surgery, they say—none of which may be given or performed by optometrists.

One ophthalmologist testified that of the thousands of patients he examined each year, he prescribes the first pair of glasses for 30 to 40 percent, and about 70 percent need either their first pair or a change in their glasses. Thus, of the thousands examined annually by each ophthalmologist, nearly one-third need some kind of medical care other than a prescription for glasses. All of the ophthalmologists testifying described various eye diseases and conditions requiring early diagnoses and treatment; these they said would probably go undetected if the examination were conducted by optometrists and medical doctors not specializing in ophthalmology. It was the consensus of the ophthalmologists testifying that 35 percent of the patients examined have what are described as pathological problems.

Under the ethics of their professions, ophthalmologists cannot advertise; optometrists, however, may and as a general practice do advertise. The ophthalmologists do not wish to be associated in the practice of their profession with a profession which advertises. All of the medical doctors do receive occasional referrals from optometrists who, in giving refractions, have discovered suspected eye disease or conditions treatable only by an ophthalmologist, but all of the ophthalmologists testifying said they have discovered many more cases of eye disease and general disease detect-

able by ophthalmologists performing eye examinations which had not been referred to medical doctors by optometrists who had examined and prescribed glasses for the same patients. The ophthalmologists, in their testimony, cited instances of patients who had been seen by optometrists—some several times in 1 year—and had been given merely a prescription for stronger glasses on each occasion yet actually needed immediate nonrefractory medical treatment for serious conditions.

Since the premiums paid by the subscribers into the various health care programs cover in-advance diagnosis, treatment, surgery, hospital care and in some instances physical and other related therapy, early detection of disease or deteriorating physical condition usually bears a direct relationship to the ultimate cost of the treatment, including the number of days to be spent in the hospital. It was thus the consensus of the ophthalmologists that they participate in the various prepaid medical programs on the assumption that a high percentage of deteriorating conditions of the eye and other diseases will be detected early through the thousands of eye examinations given annually by all of the participating ophthalmologists. Early detection of disease or deteriorating health in the long run is not only good medical practice, they contend, but sound economics, as well. Compelling the ophthalmologists to reimburse the patient for the costs of optometric refractions not only will seriously impair this procedure from a medical standpoint, they say, but impairs the obligation of their contracts with the patients, medical service corporations and hospitals by forcing them to incur obligations favoring parties with whom they have no intention of contracting, and turning over in part the avails of their contracts to parties who have not participated in them.

One of the defendants, Donald B. Hanford, Doctor of Optometry, and formerly secretary of the state optometric association, testified that optometrists do examine the eye to look for pathological conditions and that he, in the course of his practice, refers about 20 or 30 cases a year to

medical doctors for treatment. He said that optometrists perform refractions—that is, a bending of the light in the eye and measuring it for correction—and that optometrists use an ophthalmoscope with which to look at the interior of the eye to check for disease by a process of illumination and magnification. Internal eye pressure, as an indication of glaucoma, he said, is measured by tonometry without the use of drugs. He said that RCW 18.53.100 (14) contemplates that licensing of optometrists means the capability "to demonstrate in manner satisfactory to the director, their practical ability to correctly measure eyes, fit glasses, adjust frames and neutralize lenses correctly."

Dr. Hanford acknowledged that an optometrist, under pain of revocation of license, cannot lawfully hold himself out as an "eye specialist" in connection with the practice of optometry. He believed that there existed a marked difference between "vision specialist" and "eye specialist" and implied that, when optometrists employ the term "vision specialist" in their advertising, a layman would have no difficulty in ascertaining that he does not mean "eye specialist." The term "eye specialist," he said, is not available for use by optometrists. Optometrists, he said, are prohibited by law from employing drugs in their practice and from performing surgery; if the term "eye specialist" were used by an optometrist, he said, his license would be revoked. Dr. Hanford identified several bills for professional services which he had rendered to his patients who were members of the defendant Kitsap Physicians Service and which had been paid by the patient. He estimated that 20 or so of his patients were members of that program. He said he had discovered eye disease among his patients which he believed had not been discovered by ophthalmologists in previous examinations.

Henry Schumacher, Doctor of Optometry, former president of the state optometric association and presently chairman of the state board of optometry, testifying for the defense, described the requirements for admission to practice and pointed out that optometrists have from 5 to 7

years of college level education and training. He said that, as a practicing optometrist, he is reimbursed for his optometric services from the Clark County prepaid medical program. The Clark County Physicians Service, he said, pays the optometrist directly for eye refractions. Optometrists, he said, bill that medical bureau directly at the rate of $15 for eye refractions, even though optometrists are not participating members of the Clark County Physicians Service which limits its membership to medical doctors. He said that he understands the use of the term "eye specialist" by optometrists to be illegal, but that the term "vision specialist" was not. Thus, he implied, if optometrists employ the expression "vision specialist" on their advertising it would not be illegal. Optometrists, he said, do not perform surgery; they cannot employ drugs for dilation of the eyes for examination nor in treating the eyes. In summary, he testified that optometrists are not authorized to and do not treat pathology, employ drugs or perform surgery in their practices. When he personally finds a pathological condition in his patients, he said, he refers them to an ophthalmologist.

■ The evidence in this case supports the judgment of the trial court. Neither on its face nor from the detailed facts of this particular case does the statute show a rational connection between the public health, welfare and safety and the compulsory payment of fees for professional services to optometrists—even though such payments are described as a reimbursement or indemnity. To the contrary, the enforcement of this statute might well lower the standards of medical care and jeopardize the success of prepaid medical programs by depriving patients of the services of many highly trained ophthalmologists. This case shows, as does the very language of the statute, that the statute was designed and operates to collect optometrists' professional fees from a fund created by others, and with which they have no privity. It works to compel the medical doctors to answer for the debts of others, not by their own contracts and agreements but by compulsion and against their will.

Nothing in the statute elevates the requirements for the practice of either ophthalmology, optometry or general medicine and surgery—it does no more than intrude upon the financial arrangement of one contract to set up an indemnity for others not a party thereto.

██ Legislatures may not under the guise of the police power impair the specific guarantee of freedom of contract. To override the freedom of contract under the constitution, the exercise of the police power must be reasonably necessary in the interest of the health, safety, morals and welfare of the people. *County of Spokane v. Valu-Mart, Inc.,* 69 Wn.2d 712, 419 P.2d 993 (1966); *State v. Spino,* 61 Wn.2d 246, 377 P.2d 868 (1963); *Tukwila v. Seattle,* 68 Wn.2d 611, 414 P.2d 597 (1966). The statute must pass the judicial test of reasonableness, and the courts will not sustain restrictions upon useful, lawful and unharmful activities of the people or the use of property in pursuance thereof unless it is shown that the restrictions sought to be imposed by means of the police powers are rationally connected to improving or benefiting the public peace, health, safety and welfare. *State v. Spino, supra; Remington Arms Co. v. Skaggs,* 55 Wn.2d 1, 345 P.2d 1085 (1959); *Hauser v. Arness,* 44 Wn.2d 358, 267 P.2d 691 (1954); *State ex rel. Seattle Title Trust Co. v. Roberge,* 278 U.S. 116, 73 L. Ed. 210, 49 S. Ct. 50, 86 A.L.R. 654 (1928). A contract is impaired by a statute which alters its terms, imposes new conditions or lessens its value (*Tremper v. Northwestern Mut. Life Ins. Co.,* 11 Wn.2d 461, 119 P.2d 707 (1941)), and this, we think, is precisely what the statute in issue does to existing health care contracts.

That other states have upheld legislation as to future health care service contracts requiring medical doctors to include in the health care program not only optometrists but chiropodists and podiatrists (*Godfrey v. Massachusetts Medical Serv.,* ........ Mass. .........., 270 N.E.2d 804 (1971); *Maryland Medical Serv., Inc. v. Carver,* 238 Md. 466, 209 A.2d 582 (1965)), we find unconvincing on the constitutional points involved here. Nor do we find convincing the ration-

ale of *United Medical Serv., Inc. v. Holz,* 5 Misc. 2d 999, 161 N.Y.S.2d 624, *aff'd,* 4 App. Div. 2d 1017, 169 N.Y.S.2d 416 (1957), which sustained the New York statute, *i.e.,* 27 McKinney's Consol. Laws of New York Annot., Insurance Law § 250 (Supp. 1971-72), that compels medical doctors to make their health service programs available to and include as an integral part thereof licensed optometrists, podiatrists and chiropractors; and if the patient's affliction involves mental, nervous or emotional disorders and ailments, it must provide for direct participation by and indemnity to not only psychiatrists but psychologists as well. *See Western New York Medical Plan, Inc. v. Wikler,* 8 App. Div. 2d 988, 189 N.Y.S.2d 61, *aff'g* 15 Misc. 2d 277, 178 N.Y.S.2d 981 (1958), holding the statute inapplicable to medical service programs already in existence. The reasoning supporting these holdings we find faulty and unacceptable because these cases tend to aggrandize the police power of the state to the farthest limits of the legislature's collective imagination.

Another aspect of the statute generally overlooked is that the evidence shows that only some 20 to 25 percent of the ophthalmologists' patients are members of any health care program and that with regard to such patients, the bills rendered by the ophthalmologists for professional services to the health care contractor usually are substantially lower than for nonmember patients. This, of course, is done to help keep the program solvent and to encourage people to join the prepaid medical and hospital program. How many and to what extent highly specialized medical personnel will continue to participate in such programs if the courts persist in compelling them to practice in conjunction with other licensed healers such as optometrists, podiatrists, chiropractors, psychologists and other certificated healers such as suggestive therapists, mechanotherapists, physcultopathists, sanipractors and other drugless healers (RCW 18.36) and midwives (RCW 18.50), is questionable. That a few patients may elect to have their prepayments

cover the professional services of nonmedical doctors licensed by the state may in the long run work to deprive many of the professional services of the most highly trained medical specialists under a prepayment program. Such mandatory indemnity provisions we doubt can be said to advance the general welfare or the public health or safety.

Another aspect of this statute should be considered. Not only does the enactment, if upheld, so aggrandize the police power of the state that virtually any assertion hereafter made in furtherance of the police power will have to be upheld, but, additionally, it is repugnant to the Fourteenth Amendment.[1] The statute operates to take the property of the participating and contributing members of a prepaid health care program without due process of law, and grants special privileges and immunities to optometrists. Not being a member of the program and contributing nothing to it, and not sharing in the problems or costs of management, optometrists under the aegis of this statute and the compulsory indemnity features nevertheless will share in all of the benefits. If a prepaid medical program established by ophthalmologists and other medical doctors, who have helped to organize the program and continue to manage and operate it as participating members, and to which they contribute financially by reduced billing, must indemnify nonparticipating optometrists, then the medical doctors in general and ophthalmologists in particular are inevitably deprived of their property without due process of law and optometrists at the same time are given special privileges and immunities. One cannot imagine a statute that more directly achieves this unconstitutional end short of outright confiscation.

The right to contract, of course, is not sacrosanct and does not stand above the general welfare. A myriad of cases in this country have held that freedom of contract

---

[1] No person shall be deprived of life, liberty or property without due process of law (Const. art. 1, § 3) or his contracts impaired (U.S. Const. art. 1, § 10).

must give way to the overriding necessity of society in insuring domestic tranquility and protecting the public health, safety and morals, and providing for the general welfare. Thus, without regard to contracts entered into by the parties, the police power in protecting the nation's supplies of food and medicine, spending the public treasury, regulating its traffic, preserving its waters, zoning its lands, maintaining its schools and public institutions, regulating its industries and agriculture, and in a multitude of other functions affecting the public interest, have been held paramount and within the constitutional power of government. But this has never been done under any theory, tacit or express, that the freedom to contract—among individuals and with government—is not a valuable civil right and one cherished by both constitutions. The legislature, in enacting this statute, ignored this salient precept and imparted a supervisory and awesome quality to the exercise of the police power of the state. To sustain this statute would leave the state virtually unrestricted and unlimited in the exercise of its police power—a power which is neither mentioned nor described in either constitution.

Finding no such overriding power in the legislative and executive branches of government under our written constitution, we therefore affirm.

ROSELLINI, NEILL, and STAFFORD, JJ., concur.
HAMILTON, C.J., concurs in the result.

FINLEY, J. (dissenting)—The majority has gone to great lengths apparently in an attempt to show that optometrists are less desirable than ophthalmologists as members of the healing arts; that, in comparison with opthalmologists, the inability of optometrists to deal with a variety of medical conditions renders them an almost inept faction of this state's licensed practitioners. Indeed, following this descriptive essay on the comparative professionalism of the two groups, one wonders why the state chose to license optometrists. However, not only has the State of Washington licensed them, but thousands of people within this state

rely upon their services. Hence, most of this discussion by the majority seems quite irrelevant.

Further, the issue before this court is not whether the legislative enactment under consideration "against their will compels the ophthalmologists . . . to practice in a professional association with the optometrists," as suggested by the majority. Nor is it one of "[c]ompelling the opthalmologists to reimburse the patient for the costs of optometric refractions." As it happens, neither *allegation* follows from the statute:

> Whenever a health care service contractor has entered into an agreement with his subscribers for vision care, and this service is performed by a licensee under chapter 18.53 RCW, who is neither a health care service contractor nor a participant, then reimbursement or indemnity shall be provided the persons paying for this service in the same amount as that given to a participant.

Laws of 1969, ch. 143, p. 504 (RCW 48.44.025). The issue squarely put, without dubious ad lib embellishments, is whether the State of Washington may, through the exercise of its police power, protect the health and welfare of the public by ensuring indemnification for optometric services to medical care program subscribers.

It is important to note at the outset that the real parties affected by this legislation are subscribers in need of the services of optometrists; in comparison, the interest of the opthalmologist, as *a third-party beneficiary* to the contract between the program administrators and subscribers, is rather incidental to say the least. To determine whether the plaintiff-respondent ophthalmologists herein are justified in demanding that the immediate statute be stricken down as unconstitutional and that subscribers not be reimbursed by the program administrators for optometric services obtained by subscribers, it is the duty of this court to weigh the police power of the state to regulate health care service contracts against the limited interest of the opthalmologists in excluding optometrists from reimbursement by the program administrators. As the majority admits, the state's

power to regulate businesses and professions overrides contracts inconsistent therewith "[i]f a state of facts justifying the legislation in question can be conceived to exist;" the test is whether "a rational connection between the accomplishment of the purpose and the means employed" can be found. Unfortunately, after setting out this test, the majority *completely ignores it,* failing to suggest *any* purpose behind the immediate legislation, and refusing to determine whether there exists a rational connection between the end and the means. It is Justice Hunter in dissent who cogently suggests that the legislative purpose is one of providing freedom of choice to subscribers for vision care as between optometrists and opthalmologists, as well as that of affording a greater opportunity for obtaining vision care. In providing that subscribers be reimbursed for amounts expended for necessary vision care by licensed optometrists, the legislature has reasonably achieved these ends. Lacking an assessment of legislative purpose and a reasoned application of the "rational connection" test which it sets up, the majority usurps the power and function of the legislature in declaring the statute void.

In *Decker v. Decker,* 52 Wn.2d 456, 464-65, 326 P.2d 332 (1958), this court established the relation of U.S. Const. art. 1, § 10, regarding impairment of contract obligations, to the police power of the state:

> In *Home Bldg. & Loan Ass'n v. Blaisdell* (1934), 290 U. S. 398, 78 L. Ed. 413, 54 S. Ct. 231, 88 A. L. R. 1481, Chief Justice Hughes discussed the constitutional guarantee to freedom of contract. On page 347, he quoted from a previous United States supreme court case:
>
> " 'It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This power, which in its various ramifications is known as the police power, is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the

people, and *is paramount to any rights under contracts between individuals.' "*

(Italics mine.) *Accord, State v. Dexter,* 32 Wn.2d 551, 202 P.2d 906, 13 A.L.R.2d 1081 (1949), *aff'd,* 338 U.S. 863, 94 L. Ed. 529, 70 S. Ct. 147 (1949). This police power extends as well to the economic needs of the people; thus, the guaranteed reimbursement aspect of the statute before this court (RCW 48.44.025) clearly takes precedence over the terms of the immediate medical service contracts, thereby amending them. *Veix v. Sixth Ward Bldg. & Loan Ass'n,* 310 U.S. 32, 84 L. Ed. 1061, 60 S. Ct. 792 (1940).

Noting, then, that the substantive area of this legislation falls directly within the police power of the state, the only remaining question for this court involves the extent of legislative discretion in exercising this power. In this regard, the United States Supreme Court stated the following in *East New York Sav. Bank v. Hahn,* 326 U.S. 230, 232-33, 90 L. Ed. 34, 66 S. Ct. 69, 160 A.L.R. 1279 (1945):

> The formal mode of reasoning by means of which this "protective power of the State," 290 U. S. at 440, is acknowledged is of little moment. It may be treated as an implied condition of every contract and, as such, as much part of the contract as though it were written into it, whereby the State's exercise of its power enforces, and does not impair, a contract. . . . Once we are in this domain of the reserve power of a State we must respect the *"wide discretion on the part of the legislature in determining what is and what is not necessary."*

(Italics mine.) *Accord, Faitoute Iron & Steel Co. v. Asbury Park,* 316 U.S. 502, 86 L. Ed. 1629, 62 S. Ct. 1129 (1942). Therefore, observing the wide discretion of the legislature in determining, as representatives of the public, what is necessary for the health, safety, and welfare of the people, and noting the reasonable means by which the ends of free choice in, and a greater opportunity for vision care have been achieved, it is evident that the terms of the existing medical service contracts must yield to and henceforth incorporate the provision of RCW 48.44.025 that pro-

gram subscribers—*as the real parties in interest*—be reimbursed *out of the funds they have paid into their respective programs* for vision care which they purchase from licensed optometrists.

Accordingly, the ruling of the trial court, declaring invalid Laws of 1969, ch. 143 (RCW 48.44.025), should, in my judgment, be reversed.

HUNTER, J. (dissenting)—I dissent. The majority admits that neither the due process clause nor the impairment of contract clauses of our state and federal constitutions override the power of the state to establish regulations that are reasonably necessary to secure the health, safety, good order, comfort or general welfare of the community. But they hold there is no rational connection between the accomplishment of the purpose and the means employed by the legislature's passage of that section of the act in question, RCW 48.44.010, and that this constitutes an unreasonable exercise of the police powers. I disagree.

The test to be applied in prescribing the police power, and which should be applied in this case, was stated in *State v. Laitinen,* 77 Wn.2d 130, 459 P.2d 789 (1969), at 132:

> In prescribing the police power, all that is constitutionally required of the legislature is that a state of facts can reasonably be conceived to exist which would justify the legislation. If the courts can reasonably conceive of such a state of facts, they must presume that such facts actually did exist and that the statute being tested was passed with reference to them. *Shea v. Olson,* 185 Wash. 143, 53 P.2d 615, 111 A.L.R. 998 (1936); *State v. Dexter,* 32 Wn.2d 551, 202 P.2d 906, 13 A.L.R.2d 1081 (1949); *Clark v. Dwyer,* 56 Wn.2d 425, 353 P.2d 941 (1960), *cert. denied,* 364 U.S. 932, 5 L. Ed. 2d 365, 81 S. Ct. 379 (1961); *Treffry v. Taylor,* 67 Wn.2d 487, 408 P.2d 269 (1965), *appeal dismissed,* 385 U.S. 10, 17 L. Ed. 2d 10, 87 S. Ct. 70 (1966).
>
> Accordingly, if a state of facts can reasonably be conceived that will sustain a classification under the police power, there is a presumption that such facts exist. *Ace Fireworks Co. v. Tacoma,* 76 Wn.2d 207, 455 P.2d 935

(1969); *State v. Persinger,* 62 Wn.2d 362, 382 P.2d 497 (1963); *Shea v. Olson, supra.* It is not the court's function to decide whether the statute is sound or unsound, wise or unwise, effectual or ineffectual—but only whether it is within .the legislature's constitutional powers to enact it. This comports with the general democratic principle that powers of self-government have been largely reserved by the people to be exercised through their legislatures and not their courts.

Applying these general principles to the act before us, it seems clear to me that the Laws of 1969, ch. 143, constitutes a reasonable exercise of the state's police power and is reasonably related to the public health, safety and welfare. Health care services and agreements pertaining thereto have long been subject to state regulation under the Health Care Services Act (Laws of 1947, ch. 268, p. 1149-52; and amended by Laws of 1961, ch. 197, Laws of 1965, ch. 87, and Laws of 1969, ch. 115). Under this act, the service contractors and their activities have been regulated since 1947, and are. subject to future legislative controls in the interest of public health and safety. Additionally, the defendant optometrists· are licensed and regulated by the state under RCW 18.53. The new act is an addition to an already established area of regulated public activity. Its enactment is entirely within the legitimate exercise of the police power of the state legislature and the act is entitled to presumptive constitutional validity.

I am convinced that a state of facts can reasonably be conceived to exist that the act is reasonably related to and is in the interest of the public health and welfare. The defendant service contractors are engaged in activities providing for medical, surgical and health care services to large groups of persons. The record indicates that their comprehensive prepaid health insurance plans cover thousands of persons in the state of Washington. Dr. Bertram Fitzmaurice, president and medical director of King County Medical Service Corporation, testified. that his company alone had approximately 1,700 group contracts and 39,000 individual contracts in existence, covering a total of about

287,000 persons in King County. The plans of the other service contractors cover additional large numbers of persons. Laws of 1969, ch. 143, by its terms, becomes a part of any agreement whereby a service contractor provides for vision care. Looking at the objectives and purposes of the legislation, it is apparent that it was intended to give mandatorily to the subscribers the right of reimbursement for covered vision care whether such service is performed by a doctor of medicine or a licensed optometrist. The legislative purpose in enacting this provision could well have been to afford a freedom of choice to the many thousands of subscribers as between ophthalmologists and optometrists, either participating or nonparticipating, for that vision care which is covered in the contract and which both provide.

Further, under the provisions of the act there will be a greater availability of vision care to the subscribers. By reimbursement of the services of optometrists for covered vision care, the subscriber has a greater opportunity of obtaining vision care than if it were limited to ophthalmologists. It is reasonable to assume, therefore, that the legislation is in the interest of and will benefit the public health.

It is contended that the act is invalid for the reason that the act deprives the physician participant in the contract of vested property rights without due process of law. It is claimed that the act denies the ophthalmologists the benefit of their bargain in that it provides for payment to nonparticipating optometrists, thus destroying any benefit which the plaintiffs gain by entering into the contract. I do not agree.

The basic formula utilized by all the service contractors is a tri-party contractual arrangement between the service contractors, the participant doctors of medicine, and the subscribers. The subscribers, who are by far the largest beneficiary in number under the contracts, are not challenging the legislation, nor are the defendant service contractors. It is only the plaintiff ophthalmologists who feel aggrieved.

It is my opinion that the plaintiffs will retain all, or

substantially all, of the benefits of their bargain, notwithstanding the new enactment. The act will not add any new services to the coverage. It merely provides that *if* vision care is covered by the service contractors, the subscribers will be reimbursed whether that service is provided by a participant ophthalmologist or an optometrist. The plaintiffs may still look to the fund established by the service contractors for payment of their fees. The optometrist will receive no more payment from the fund for his services than the ophthalmologist receives for providing that vision care which both the optometrist and ophthalmologist are qualified to render. Since the fees charged the subscribers are adjusted by the service contractors to maintain the fund, the plaintiffs will not be harmed by payments to nonparticipant optometrists. The plaintiffs may still have their names appear on a list of medical doctors to whom the subscribers are directed when they seek medical and/or surgical attention. And the new act will not change the plaintiffs' membership in an association dedicated to the providing of low cost, prepaid medical and health care services to the public through its subscribers.

It is significant that the plaintiffs knew when they entered into these health care service contracts that it was a highly regulated field of activity. RCW 48.44.020 specifically provides in part:

> (2) The commissioner [Insurance Commissioner] may require the submission of contract forms for his examination and may on examination, subject to the right of the health care service contractor to demand and receive a hearing under chapters 48.04 and 34.04 RCW, disapprove any contract form for any of the following grounds:
>
> (a) If it contains or incorporates by reference any inconsistent, ambiguous or misleading clauses, or exceptions and conditions which unreasonably or deceptively affect the risk purported to be assumed in the general coverage of the contract; or
>
> (b) If it has any title, heading or other indication of its provisions which is misleading; or
>
> (c) If purchase of health care services thereunder is being solicited by deceptive advertising; or

(d) *If, the benefits provided therein are unreasonable in relation to the amount charged for the contract; or*

(e) *If it contains unreasonable restrictions on the treatment of patients.*

(Italics ours.) RCW 48.44.015 requires any person who holds himself out to be a health care service contractor to register with the commissioner. RCW 48.44.030 requires certain indemnity agreements. RCW 48.44.040 requires every health care service contractor, who enters into agreements which require prepayment for health care services, to register with the insurance commissioner, and it further provides for filing of the rate schedules. RCW 48.44.050 authorizes the insurance commissioner to make reasonable regulations in aid of the administration of the chapter. RCW 48.44.060 makes a violation of any of the provisions of the chapter a gross misdemeanor. RCW 48.44.070 requires forms of contracts between health care service contractors and participants to be filed with the insurance commissioner prior to use. Other provisions of the Health Care Services Act contain additional regulations relating to health care services.

The above provisions in the Health Care Services Act make it abundantly clear that the plaintiffs had notice of the right of the legislature, in the exercise of its police power, to enact reasonable modifications of the Health Care Services Act affecting their contracts, in furtherance of the purposes of the act. This legislative right is implicitly a part of the contract agreements between the parties.

The plaintiffs' freedom of contract, moreover, is preserved since they are permitted to withdraw from the contracts with the service contractors with little or no notice under the terms of the contracts.

For the reasons heretofore stated, this court should hold that Laws of 1969, ch. 143, p. 504-05, is a valid exercise of the police power, is reasonably related to the public health and safety, and is not a violation of federal or state due process standards.

The judgment of the trial court should be reversed.

FINLEY, J., concurs with HUNTER, J.

WRIGHT, J. (dissenting)—The question presented herein is whether or not it constitutes an impairment of contract for the legislature to enact a statute (RCW 48.44.025) relative to vision care. The statute in question provides that if vision care service is performed by a licensed optometrist (licensed under RCW 18.53) who is not a health care service contractor or a participant, then, in that event, the subscriber is entitled to reimbursement in an amount equal to the fee that would be paid to a participant (ophthalmologist).

The health care service contract is a 3-party arrangement with two separate contracts. One contract is between the health care service contractor and a physician who is denominated the "participant". The other contract is between the corporation and the individual who is to receive care and who pays, denominated the "subscriber".

The health care service contractor may be a corporation, cooperative group or association or a physician or group of physicians, group of hospitals, pharmacist or group of pharmacists licensed in the state of Washington. If it be a corporation or association, it must be composed of, or closely associated with, physicians, or composed of, or closely associated with pharmacists. The health care service contractor is defined in RCW 48.44.010(3) as one "who or which not otherwise being engaged in the insurance business, accepts prepayment for health care services . . ."

There are many indications in the statute that the legislature regarded health care service contracts to be a form of insurance. The administration is vested in the insurance commissioner. The statute is included in RCW Title 48, which title relates to insurance. The act contains the above quoted words "not otherwise being engaged in the insurance business, . . ."

The agents who sell health care service contracts are licensed under the provisions applicable to insurance agents (RCW 48.17) and agents licensed to sell disability insurance do not need an additional license (RCW 48.44.015(3)). In addition to those mentioned, there are many indications

that health care service contracts were regarded by the legislature as a form of insurance or closely related thereto. The same conclusion has been reached by this court in *McCarty v. King County Medical Serv. Corp.*, 26 Wn.2d 660, 175 P.2d 653 (1946).

It is recognized that the insurance business is related to the public welfare (RCW 48.01.030). Insurance is subject to regulation under the state's police power. *Kueckelhan v. Federal Old Line Ins. Co.*, 69 Wn.2d 392, 418 P.2d 443 (1966); *Continental Ins. Co. v. Fishback*, 154 Wash. 269, 282 P. 44 (1929); *Northwestern Nat'l Ins. Co. v. Fishback*, 130 Wash. 490, 228 P. 516, 36 A.L.R. 1507 (1924); *German Alliance Ins. Co. v. Lewis*, 233 U.S. 389, 58 L. Ed. 1011, 34 S. Ct. 612 (1914).

A statute enacted under the authority of the police power may impair the obligation of contract. *Raymond Lumber Co. v. Raymond Light & Water Co.*, 92 Wash. 330, 159 P. 133 (1916); *Seattle v. Hurst*, 50 Wash. 424, 97 P. 454 (1908).

The legislature has broad powers to enact legislation for the public good. The presumption of the validity of a duly enacted statute attaches to such legislation. We said in *Shea v. Olson*, 185 Wash. 143, 151, 53 P.2d 615, 111 A.L.R. 998 (1936):

> It is a well-settled principle of law, followed by all courts, that the presumption is in favor of the constitutionality of a statute. 6 R. C. L. 97, § 98. As expressed in our decisions, the rule in this state is that the court will not declare a law unconstitutional unless its invalidity is so apparent as to leave no reasonable doubt on the subject. [Citing cases.]

Legislation enacted under the police power must bear some relation to the evil sought to be remedied or to promote some interest of the state. As pointed out by Hunter, J., the legislature may well deem the public interest requires the preservation of a freedom of choice as between different classes of practitioners licensed by the state to give vision care. It is the subscriber who pays for care, who receives the service, and who provides the funds to make

the entire operation workable. There also may well be other reasons which impelled the legislature to so act. As was said in *Shea v. Olson, supra* at 154:

A large discretion is therefore vested in the legislature to determine what the public interest demands and what measures are necessary to secure and protect the same. *State v. Somerville*, 67 Wash. 638, 641, 122 Pac. 324.

In *Campbell v. State*, 12 Wn.2d 459, 122 P.2d 458 (1942) we said at page 466:

This court has several times recognized the rule that, in passing upon the constitutionality of a statute enacted pursuant to the police power, it is not necessary that the court find the existence of a state of facts which would justify the particular statute in question, it being sufficient if it be deemed within the bounds of reasonable possibility that such a state of facts may exist. [Citing cases.]

The existence of facts sufficient to justify the legislation here in question may reasonably be presumed.

If we say the provisions herein complained of do not bear any reasonable relation to the evils sought to be corrected, we are substituting our judgment for the wisdom of the legislature as to what is good for the welfare of the state and its citizens. That we cannot do.

In a somewhat converse situation we said in *Williamson v. Grant County Pub. Hosp. Dist. 1*, 65 Wn.2d 245, 250, 396 P.2d 879 (1964):

[T]hat the legislature has recognized and established distinctions between the branches of the healing arts which it considers necessary for the public good. Courts will not question the legislative wisdom of these distinctions so long as there is any reasonable basis for them. *Ellestad v. Swayze*, 15 Wn. (2d) 281, 291, 130 P. (2d) 349 (1942), and cases cited.

Without more, the judgment should be reversed upon the ground this is a matter within the police power of the state, and, hence, the statute is valid. There is, however, another reason for reversal. There is no impairment of contract.

We have here three parties who enter into two contracts. Only the "health care service contractor", usually referred

to as the "corporation" or the "bureau" is a party to both contracts. One contract is between the bureau and the subscriber. The other contract is between the bureau and the physician. Less commonly, the second contract may be between the bureau and a pharmacist or a hospital.

Only the contract between the subscriber and the bureau is affected by the statute in question. The subscriber is granted additional rights against the bureau. No bureau or other health care service contractor is a plaintiff herein, nor making any complaint against the statute.

On the other hand, the contract which the majority says is impaired is the contract between the bureau and the participant (physician). That contract is in nowise affected by the statute. The plaintiffs are all participants.

Even assuming the contract between the bureau and the subscriber is altered by the statute, that matter cannot be raised by the plaintiffs herein. No person may question the constitutionality of a statute as to matters which do not affect him. *State ex rel. Hansen v. Salter,* 190 Wash. 703, 70 P.2d 1056 (1937); *Port of Tacoma v. Taxpayers,* 53 Wn.2d 734, 336 P.2d 872 (1959); *National Bank of Commerce v. Green,* 1 Wn. App. 713, 463 P.2d 187 (1969).

Plaintiffs herein are all ophthalmologists, participants. Unless they, or one or more of them, has suffered an impairment of contract they cannot maintain the action. Since plaintiffs did not allege any violation of article 1, section 10 of the federal constitution, we are concerned only with a claimed violation of article 1, section 23 of the state constitution.

While there are several contracts involved between physicians and the various bureaus, they generally follow the same pattern. A typical example is the contract between the King County Medical Service Corporation and an individual physician (exhibit 10). A copy of said contract is reproduced herein. It will be noted that there are several provisions in the contract that lack the character of a binding obligation.

The preamble states the physician will render services "upon a basis of receiving such fees as the patient is able to pay for the services rendered". In subdivision 4 the physician agrees to abide by the rules and regulations which have been *or may be in the future* "laid down by the company and/or its medical director". In subdivision 5 the physician agrees to accept in full payment for services such fees as are fixed by the medical director. In subdivision 6 the company agrees to pay to the physician such fee as "shall be fixed by the medical director". Subdivision 7 provides: "This agreement may be cancelled by either party at any time without cause".

The law is stated in 17 Am. Jur. 2d *Contracts* § 79 (1964) as follows:

Clearly, a reservation to either party to a contract, of an unlimited right to determine the nature and extent of his performance, renders his obligation too indefinite for legal enforcement. This rule applies, for instance, to the reservation of an unlimited right to determine the nature and extent of the compensation under a contract.

In 17 Am. Jur. 2d *Contracts* § 83 (1964) it is said:

As a general rule, a reservation to a party of an unlimited right to determine the nature and extent of the compensation he will make renders his promise too indefinite to be enforceable. This rule applies to agreements which are *wholly executory.*

(Italics mine.) The contract involved herein was wholly executory.

The rule is well established that a contract is not within the protection of the constitutional provision against the impairment of the obligation of a contract unless it is a valid, legally enforceable, complete agreement.

The language of the state constitutional provision is contained in article 1, section 23, which reads in full:

No bill of attainder, ex post facto law, or law impairing the obligations of contracts shall ever be passed.

By way of comparison, the federal constitution, article 1, section 10, is practically identical. We are not here con-

cerned with the provision of the federal constitution except that cases construing that provision are useful as authority.

In *Ochiltree v. The R.R. Co.*, 88 U.S. (21 Wall.) 249, 252, 22 L. Ed. 546 (1874), it was said:

the obligation of a contract within the meaning of the Constitution is a valid subsisting obligation, not a contingent or speculative one.

It is said in 16A C.J.S. *Constitutional Law* § 352 (1956):

The obligation of a contract is the law which binds the parties to perform their agreement.

In the instant case, there being no valid, binding obligation, there can be no impairment of the obligation.

Neither party to the contract between the subscriber and the bureau is complaining herein. By the terms of the statute, the subscriber is given an additional choice in the selection of a practitioner to prescribe eyeglasses for him. We are not called upon to decide if there is any impairment, thereby, of the contract between the subscriber and the bureau.

As hereinbefore mentioned, a party not adversely affected by a statute cannot question its constitutionality. *Kitsap County v. Bremerton*, 46 Wn.2d 362, 281 P.2d 841 (1955); *National Bank of Commerce v. Green*, 1 Wn. App. 713, 463 P.2d 187 (1969).

The statute in nowise affects the only contract to which plaintiffs are parties. True, plaintiffs fear competition. In that connection, however, there is nothing in the contract guaranteeing to plaintiffs any particular number of patients. The contract does not specify how many ophthalmologists may be participants, nor how many subscribers there shall be. Any possible diminution of plaintiffs' income from the operation of the statute is highly speculative and conjectural. It takes more than a vague fear of competition (against which plaintiffs have no contractual protection) to justify a claim of impairment of the obligation of a contract. This is the more true when there is no obligation.

*Tremper v. Northwestern Mut. Life Ins. Co.*, 11 Wn.2d

461, 119 P.2d 707 (1941) is an example of the type of matter that is an impairment of contract. There the statute in question sought to change the interest to be charged on a policy loan from 6 percent simple interest to 6 percent compound interest. Such was held to be an impairment of contract. That was a direct change in the terms of the contract, and is readily distinguishable from the case at bench.

It must be remembered the statute in question was regularly enacted by the legislature of the state. "One who challenges the constitutionality of a statute carries the burden of proving its invalidity. *State v. Primeau*, 70 Wn.2d 109, 422 P.2d 302 (1966)." *Seattle v. Jones*, 79 Wn.2d 626, 628, 488 P.2d 750 (1971). The plaintiffs herein have not met that burden and the statute should be declared to be constitutional.

Finally, it must be recognized that in no event can any contract made after the enactment of the statute be said to be impaired. As we said in *Minish v. Hanson*, 64 Wn.2d 113, 115, 390 P.2d 704 (1964):

> The plaintiffs recognize the well-settled rule that the obligation of a contract cannot properly be said to be impaired by a statute in force when the contract was made, for in such cases it is presumed that it was made in contemplation of the existing law. Numerous cases so holding are cited in 12 Am. Jur., Constitutional Law § 387, pp. 15, 16.

The above citation is presently to be found in 16 Am. Jur. 2d *Constitutional Law* § 440, at 787, 788, together with more recent cases.

The judgment appealed from should be reversed.

FINLEY, J., concurs with WRIGHT, J.

Petition for rehearing denied January 16, 1973.

APPENDIX A

AGREEMENT BETWEEN KING COUNTY MEDICAL SERVICE CORPORATION AND PHYSICIAN

THIS AGREEMENT, made and entered into this ............................ day of

........................., A.D., 19........., between KING COUNTY MEDICAL SERVICE CORPORATION as first party, hereinafter referred to as "the Company," and ................................., a physician duly and regularly licensed to practice his profession in the State of Washington and residing in King County, Washington, as second party, and hereinafter referred to as "the physician" or "this physician," WITNESSETH:

THAT WHEREAS, the company was organized for the purpose of securing the benefits of medical and surgical care, nursing and hospitalization to many individuals whose financial condition has made it impossible for them to receive such services in the past, and

WHEREAS, the physician is willing to assist in the execution of said proposal upon a basis of receiving such fees as the patient is able to pay for the services rendered, now, therefore, in order to fix the rights and liabilities of the parties hereto during the continuance of such an arrangement, IT IS AGREED between the parties hereto as follows:

1. The physician hereby constitutes and appoints the company his agent to offer his services to those who shall make the company the periodical payments which it prescribes and which persons are hereinafter referred to as "patient"; all upon the terms and conditions hereinafter set forth. The physician agrees that this instrument shall constitute an irrevocable offer by the physician to the patient for the performance of the services hereinafter described, either personally or through some other physician who is a member of the KING COUNTY MEDICAL SERVICE BUREAU.

2. The company shall enter into similar contracts with other physicians whose qualifications entitle them to apply for membership in the KING COUNTY MEDICAL SERVICE BUREAU. The company shall also receive the periodical payments which it may from time to time prescribe to be paid by groups and/or individuals in and in the vicinity of King County, Washington, as payment for the services of such physicians, all upon such terms and under such regulations as the company may prescribe.

3. The physician agrees that he will, to the extent to which his services shall have been promised by the company to the patient and subject to the terms and conditions set forth in this agreement, treat all persons who make, or on whose behalf shall have been made, the periodic payments for services required by the company. The physician will perform said services whether requested so to do by the patient or by the medical director of the company who is hereinafter referred to as "the medical director."

4. The physician agrees that he will abide by all of the rules and regulations governing the furnishing of such services and/or touching upon his relationship with the patient, and/or with the company which have been laid down, or shall hereinafter be established by the company and/or its medical director.

5. The physician agrees that he will accept in full for his services performed hereunder the fees fixed by the medical director without any charge to the patient.

6. The company agrees that as soon after the completion of his services for such patient as is reasonably practicable and upon compliance by the physician with all the requirements of the medical director, the company will pay the physician such reasonable compensation as shall be fixed by the medical director. The company agrees that in furtherance of the charitable purpose of its organization it will not permit any individual, firm or corporation to receive from it any sums which it collects except as a reasonable payment for services performed for, or property delivered to, the company; provided, however, that the company may, in its discretion, in the furtherance of the charitable purpose of its organization, grant such free services to the deserving poor as the company in its judgment may determine. The company agrees that it will never distribute any funds received by it as dividends or profit to any officer or member of the corporation whatsoever.

7. This agreement may be cancelled by either party at any time without cause.

8. It is agreed that the prudent and successful management of the charitable activity in which the parties hereto are engaged requires that a certain reserve must be created by the company whereby the continuity of its operation and service may be assured to said patients. To that end the company is hereby authorized to create such reserve as, in the opinion of its board of directors, is reasonably necessary to insure patients that the service contracted for will be carried on in the contingency of an epidemic. The physician shall be subject to equal obligations and entitled to equal rights and benefits with all other physicians who have similar contracts with said company; but he shall have no interest whatsoever in or to the said reserve balance of the company.

9. The medical director of the company shall determine who are entitled, and the services to which, and the time for which they are entitled, to the services of the physician as provided in this agreement.

10. If emergency treatment shall be given the patient by a physician who is not a member of the KING COUNTY MEDICAL SERVICE BUREAU, and if such non-member physician shall consent, then and in that event this physician agrees that the medical director shall fix a total fee for the entire service to the patient, including such emergency treatment and shall divide the same equitably between such non-member physician and this physician and no charge shall be made against the patient by the non-member physician nor by this physician for any of such treatment.

IN WITNESS WHEREOF, the parties have caused these presents to be executed in duplicate original the day and year first above written.

KING COUNTY MEDICAL SERVICE CORPORATION

By .................................................................................................................................

Its .................................................................................................

The Company

.............................................................................................................................

The Physician